[No. S007838. May 4, 1989.]

CALFARM INSURANCE COMPANY et al., Petitioners, v.
GEORGE DEUKMEJIAN, as Governor, etc., et al., Respondents;
ACCESS TO JUSTICE FOUNDATION et al., Real Parties in
Interest;
AMERICAN COUNCIL OF LIFE INSURANCE et al., Interveners.

COUNSEL

Skadden, Arps, Slate, Meagher & Flom, Frank Rothman, Darrel J. Hieber, John S. Yun, Gary S. Glickman, McCutchen, Doyle, Brown & Enersen, David M. Balabanian, Beth H. Parker, John C. Morrissey, Hajime Tada, Leboeuf, Lamb, Leiby & Macrae, James R. Woods, Sanford Kingsley, Horvitz, Levy & Amerian, Ellis J. Horvitz, Munger, Tolles & Olson, Allen M. Katz, Crosby, Heafey, Roach & May, Raoul D. Kennedy, Ezra Hendon, Cooper, White & Cooper, James S. Greenan and John P. Makin for Petitioners.

Gibson, Dunn & Crutcher, John L. Endicott, Ronald A. Zumbrun, John H. Findley, Anthony T. Caso, Sharon L. Browne, Barger & Wolen, Richards D. Barger, Royal F. Oakes, Richard G. De La Mora, Robert E. Feyder, Roger L. McNitt, Robert K. Schraner, S. Stuart Soldate, Randall A. Doctor, Michael L. Rosenfield, Kent Keller, Steven H. Weinstein, Larry M. Golub, Ball, Hunt, Hart, Brown & Baerwitz, John R. McDonough, Allan E. Tebbetts, Judith F. Burkey, Latham & Watkins, Gerald J. Lewis, Donald P. Newell, Mark S. Pulliam, Kristine L. Wilkes, Gary D. Simms, Sidley & Austin, Richard Schauer, Thomas H. Keeling, Harry M. Snyder, Gail K. Hillebrand, Nettie Y. Hoge, Haight, Brown & Bonesteel, Roy G. Weatherup, Robert L. Kaufman, Zeb Francoeur, Cotkin, Collins & Franscall, Raphael Cotkin, Laurence J. Rubinow, Eric S. Oto, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Michael J. Brady, Bronson, Bronson & McKinnon and Julia A. Molander as Amici Curiae on behalf of Petitioners.

John K. Van de Kamp, Attorney General, Richard D. Martland, Michael J. Strumwasser, Fredric D. Woocher, Timothy G. Laddish, Joseph M. O'Heron, Jack T. Kerry, Carol H. Rehm, Jr., Deputy Attorneys General, Vance W. Raye, Tani C. Cantil and Fermin Ramos for Respondents.

James K. Hahn, City Attorney (Los Angeles), Charles I. Goldenberg, Assistant City Attorney, Edmund Fimbres, Deputy City Attorney, Robert P. Newman, Mary M. Lee, D. Robert Shuman and John W. Davies as Amici Curiae on behalf of Respondents.

Cotchett & Illston, Joseph W. Cotchett, Susan Illston, Alan W. Haverty, Hedges, Powe & Caldwell, George R. Hedges, Josephine E. Powe, Robert Fellmeth, James R. Wheaton, Karl M. Manheim, Peter J. Donnici, Daniel J. Lathrop, Robert Post, Louis Schwartz and George Alexander for Real Parties in Interest.

R. Blair Reynolds and Christopher Chenoweth as Amici Curiae on behalf of Real Parties in Interest.

Adams, Duque & Hazeltine, James M. Fleming, Jeffery Anne Tatum, Heron, Burchette, Ruckert & Rothwell, Robert H. Myers, Jr., Mark D. Nozette, Kenneth C. Sundlof, Jr., John A. Norwood and Robert J. Franceschi for Interveners.

Lewis Keller, Bradley E. Wenger and Brent A. Barnhart as Amici Curiae on behalf of Petitioners and Interveners.

Stone & Healy, Michael P. Stone, Mary Ann Healy, Pat Thistle and Enrique Hernandez as Amici Curiae.

## OPINION

**BROUSSARD, J.**—In this case we consider various challenges to Proposition 103, an initiative measure enacted November 8, 1988, making numerous fundamental changes in the regulation of automobile and other types of insurance.[1] Petitioners, seven insurers and the Association of California Insurance Companies, have filed an original petition for writ of mandate in this court, contending that Proposition 103 is unconstitutional on its face.[2] They named as respondents Governor George Deukmejian, Attorney General John K. Van de Kamp, Insurance Commissioner Roxani Gillespie, and the State Board of Equalization. The Access to Justice Foundation and other supporters of Proposition 103 (hereafter proponents) have appeared as real parties in interest to oppose the petition. We have also received numerous amicus curiae briefs.

In view of the obvious importance of the case, and the need for a prompt decision (since certain contested provisions are effective for only one year), we assumed original jurisdiction and issued an alternative writ. (See *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236 [186 Cal.Rptr. 30, 651 P.2d 274]; *Hardie* v. *Eu* (1976) 18 Cal.3d 371 [134 Cal.Rptr. 201, 556 P.2d 301].) Before addressing individually the issues raised by petitioners, we will summarize the initiative's provisions, the contentions raised in regard to those provisions, and our conclusions.

The initiative begins with a statement of findings and purpose, asserting that "[e]normous increases in the cost of insurance have made it both

---

[1] Proposition 103 applies to "all insurance on risks or on operations in this state, except those listed in Section 1851." Insurance Code section 1851 lists reinsurance, life insurance, title insurance, certain types of marine insurance, disability insurance, workers' compensation insurance, mortgage insurance, and insurance transacted by county mutual fire insurers.

[2] The American Council of Life Insurance, the Health Insurance Association of America, and the Independent Insurance Agents and Brokers of California have all been granted leave to intervene on behalf of petitioners.

unaffordable and unavailable to millions of Californians," and that "the existing laws inadequately protect consumers and allow insurance companies to charge excessive, unjustified and arbitrary rates." The initiative's stated purpose is to ensure that "insurance is fair, available, and affordable for all Californians."

Insurance rates are to be immediately reduced to "at least 20 percent less" than those in effect on November 8, 1987 (approximately the date when the initiative was proposed, and one year prior to its enactment). (§ 1861.01, subd. (a); all statutory references are to the Insurance Code, unless otherwise stated.)[3] All rate increases require the approval of the Insurance Commissioner, who may not approve rates which are "excessive, inadequate, unfairly discriminatory or otherwise in violation of [the initiative]." (§ 1861.05.) Prior to November 8, 1989, however, rates may be increased only if the commissioner finds "that an insurer is substantially threatened with insolvency." (§ 1861.01, subd. (b).) Certain procedures are specified for hearing applications for rate approvals. (§§ 1861.04-1861.10.)

The initiative prohibits an insurer from declining to renew a policy except for nonpayment of premium, fraud, or significant increase in the hazard insured against. (§ 1861.03, subd. (c).) Insurers are required to mail notices to policy holders informing them they may join a nonprofit corporation to be formed to represent their interests by persons appointed for this purpose by the Insurance Commissioner. (§ 1861.10.) The Board of Equalization is directed to adjust the tax rate on insurance premiums to avoid any loss of tax revenues as a result of decreases in the rates charged by insurers. (Rev. & Tax. Code, § 12202.1.) Finally, the initiative contains a severance provision stating that the invalidity of any portion of the initiative "shall not affect other provisions or applications of the act which can be given effect without the invalid portion . . . ."[4]

---

[3] Section 1861.01 further provides: "(d) For those who apply for an automobile insurance policy for the first time on or after November 8, 1988, the rate shall be 20% less than the rate which was in effect on November 8, 1987, for similarly situated risks. [¶] (e) Any separate affiliate of an insurer, established on or after November 8, 1987, shall be subject to the provisions of this section and shall reduce its charges to levels which are at least 20% less than the insurer's charges in effect on that date." Our discussion of the initiative's rate rollback and reduction provisions applies to subdivisions (d) and (e) as well as to subdivision (a) of section 1861.01.

[4] Other provisions of the initiative, not challenged here, require that automobile insurance rates, beginning in November 1989, be based on driving record, number of miles driven, years of driving experience, and other factors approved by the commissioner, that good drivers receive a 20 percent discount on automobile insurance rates, that the insurance industry be subject to the Unruh Civil Rights Act (Civ. Code, §§ 51-53), antitrust laws and unfair business practice laws, and that the Insurance Commissioner be an elective office beginning with the 1990 election.

On November 10, 1988, we granted petitioners' request to stay the initiative in its entirety. On December 7, 1988, after deciding to assume jurisdiction of the case, and after further study of the issues presented, we vacated the stay except as to the provisions requiring a rate reduction to 20 percent below 1987 rates, limiting relief to companies substantially threatened with insolvency, and requiring a mailing notifying insureds of the opportunity to join a nonprofit corporation to advocate their interests.

Petitioners contend that the initiative's rate regulation provisions violate the due process clauses of the United States and California Constitutions in that the initial reduction to 20 percent below 1987 levels is arbitrary, discriminatory and confiscatory, the rate adjustment mechanism during the first year does not permit relief from confiscatory rates, and adequate procedures have not been provided to ensure prompt rate relief. They challenge the provision limiting insurers' power not to renew policies as impermissibly impairing existing contract rights. Petitioners maintain that the provision requiring notification of the formation of a nonprofit corporation violates the prohibition of article II, section 12 of the California Constitution against naming or identifying a private corporation in an initiative to perform any function or duty. Finally, they object to the provisions for adjustment of the tax rate on insurance premiums on several grounds: (a) that article XIII, section 28, of the California Constitution bars use of the initiative to change the premium tax rate; (b) that article XIII A, section 3 either bars the use of the initiative to increase taxes, or requires that such measures receive approval of two-thirds of the voters; and (c) that the provision impermissibly delegates legislative authority to the Board of Equalization. In addition, petitioners contend that the invalid portions of the initiative are nonseverable and therefore the entire initiative must be declared invalid.

These contentions challenge the constitutional authority of the people to enact Proposition 103 and certain portions of that initiative. ■ In adjudicating such constitutional issues, our duty is clear: "We do not consider or weigh the economic or social wisdom or general propriety of the initiative. Rather, our sole function is to evaluate [it] legally in the light of established constitutional standards." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281]; see *Ferguson* v. *Skrupa* (1963) 372 U.S. 726, 730 [10 L.Ed.2d 93, 97, 83 S.Ct. 1028, 95 A.L.R.2d 1347].) ■ "[A]ll presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears." (*In re Ricky H.* (1970) 2 Cal.3d 513, 519 [86 Cal.Rptr. 76, 468 P.2d 204]; *In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296]; *Lockheed Aircraft Corp.* v. *Superior Court*

(1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701].) If the validity of the measure is "fairly debatable," it must be sustained. (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 605 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *Hamer* v. *Town of Ross* (1963) 59 Cal.2d 776, 783 [31 Cal.Rptr. 335, 382 P.2d 375] and cases there cited.)

Applying these principles, we have reached the following conclusions: 1. Section 1861.01, subdivision (b), which provides that the commissioner cannot approve a rate increase before November of 1989 unless the insurer is substantially threatened with insolvency, is unconstitutional on its face, but severable from the other parts of the initiative. With the insolvency provision removed, the remaining regulatory provisions should afford insurers an effective means of relief from any confiscatory rate. Moreover, during the first year of the initiative, an insurer may apply for rate relief and upon making that application charge the rates it requests, but must refund with interest any premiums collected in excess of the rates ultimately approved. In view of these safeguards, we conclude that except for the insolvency standard the provisions of Proposition 103 relating to the setting of insurance rates, and procedures for the adjustment of rates, do not on their face deprive insurers of due process under the state or federal Constitutions.

2. Proposition 103's limitation upon the insurer's power to refuse to renew policies (§ 1861.03, subd. (c)) applies to policies in effect when the initiative was enacted. Applying the nonrenewal provision to such policies does not unconstitutionally impair the obligation of contracts, but insurers retain the right to withdraw from the California market by complying with the statutory procedure for the surrender of their certificates.

3. Section 1861.10, subdivision (c), which provides for the creation of a consumer-advocacy corporation, and the mailing of notice to invite policyholders to become members of that corporation, violates article II, section 12, of the California Constitution, which forbids an initiative statute from identifying a private corporation to perform any function. The invalid subdivision is severable from the remainder of the initiative.

4. We do not decide the validity of Proposition 103's provision authorizing the Board of Equalization to adjust the insurance premium tax. (Rev. & Tax. Code, § 12202.1.) Deciding that issue now would violate article XIII, section 32, of the California Constitution, which provides that courts should not prevent or enjoin the collection of any tax. Since the tax adjustment provision is severable, a later ruling on its validity will not affect the validity of other parts of the initiative.

5. Since all parts of Proposition 103 are reasonably germane to the subject of insurance rates and regulation, the initiative does not violate the single-subject rule (Cal. Const., art. II, § 8, subd. (d)).

1. *Provisions relating to the reduction and subsequent adjustment of insurance rates.*

■ The constitutional test for the validity of state price controls was established in *Nebbia* v. *New York* (1934) 291 U.S. 502, 539 [78 L.Ed. 940, 958, 54 S.Ct. 505, 89 A.L.R. 1469]: "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." The United States Supreme Court reaffirmed this test in *Pennell* v. *City of San Jose* (1988) 485 U.S. 1, 13 [99 L.Ed.2d 1, 14, 108 S.Ct. 849, 857]. We followed it in *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001], a rent control case, and went on to explain that "[t]he provisions are within the police power if they are reasonably calculated to eliminate excessive rents and at the same time provide landlords with a just and reasonable return on their property." (P. 165.)

■ The state and federal Constitutions are concerned not so much with the way in which the initial rates are set as with whether the rates as finally set are confiscatory.[5] "[I]t is the result reached not the method employed which is controlling." (*Power Comm'n* v. *Hope Gas Co.* (1944) 320 U.S. 591, 602 [88 L.Ed. 333, 345, 64 S.Ct. 281]; see *Dusquesne Light Co.* v. *Barasch* (1989) 488 U.S. __ [102 L.Ed.2d 646, 658-659, 109 S.Ct. 609, 617].) In *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 683 [209 Cal.Rptr. 682, 693 P.2d 261], we reaffirmed the rule that "whether a regulation produces a return that is confiscatory or fair depends ultimately on the result, and . . . we will invalidate an ordinance on its face only if its terms preclude avoidance of confiscatory results." Petitioners must show that the law is "so restrictive as to facially preclude any possibility of a just and reasonable return" (*Hutton, supra,* 350 A.2d 1, 16); that "its terms will not permit those who administer it to avoid confiscatory results" (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, 165).

Consequently, we focus less on the rate specified in the statute than on the ability of the seller to obtain relief if that rate proves confiscatory. The face of a statute rarely reveals whether the rates it specifies are confiscatory

---

[5] The terms "fair and reasonable" and "confiscatory" are antonyms, not separate tests. (See *FPC* v. *Texaco, Inc.* (1974) 417 U.S. 380, 392 [41 L.Ed.2d 141, 153, 94 S.Ct. 2315]; *Board of Comm'rs* v. *N. Y. Tel. Co.* (1926) 271 U.S. 23, 31 [70 L.Ed. 808, 812, 46 S.Ct. 363]; *Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543 [350 A.2d 1, 15] [hereafter *Hutton*].)

or arbitrary,[6] but necessarily discloses its provisions, if any, for rate adjustment. Recognizing that virtually any law which sets prices may prove confiscatory in practice, courts have carefully scrutinized such provisions to ensure that the sellers will have an adequate remedy for relief from confiscatory rates.[7] In *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, for example, we struck down a rent control law because its procedures were so cumbersome and time-consuming that landlords could not in reality obtain relief from confiscatory rates.

█ We therefore begin our discussion by considering the provisions in Proposition 103 which would permit an insurer to seek relief from any rate it considers confiscatory. Section 1861.05 provides that "[e]very insurer which desires to change any rate shall file a complete rate application with the commissioner." Subdivision (a) of sections 1861.05 states that the commissioner may not approve or permit any rate "which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter"— language which makes it clear that the commissioner can grant relief from confiscatory rates. █ Section 1861.01, subdivision (b), however, qualifies section 1861.05 by limiting rate adjustments prior to November 1989 to insurers substantially threatened with insolvency. Petitioners attack the constitutionality of this limitation.

---

[6] Cases rejecting a facial attack on rates include *Permian Basin Area Rate Cases* (1968) 390 U.S. 747 [20 L.Ed.2d 312, 88 S.Ct. 1344] (natural gas rates); *Minn. Ass'n of Health Care* v. *Minn. Dept. of P.W.* (8th Cir. 1989) 742 F.2d 442 (nursing home rates); *Whitney* v. *Heckler* (11th Cir. 1986) 780 F.2d 963 (rates for Medicare patients); *Smith* v. *Department of Insurance* (Fla. 1987) 507 So.2d 1080 (liability insurance rates); *American Mfrs. Mut. Ins. Co.* v. *Com'r of Ins.* (1978) 374 Mass. 181 [372 N.E.2d 520] (auto insurance rates); *Hutton, supra,* 350 A.2d 1, 16 (rents).

We have discovered only one case which held a rate facially unconstitutional, *Mora* v. *Mejias* (1st Cir. 1955) 223 F.2d 814. The retention of price controls in Puerto Rico after they were abolished in the continental United States compelled all Puerto Rican rice importers to sell rice for considerably less than they paid for it. The court's decision invalidating the Puerto Rican rates was possible only because prices in the United States, a crucial datum not apparent on the face of the statute, were determined in public commodity markets and subject to judicial notice.

Petitioners also cite *Aetna Casualty & Surety Co.* v. *Commissioner of Ins.* (1970) 358 Mass. 272 [263 N.E.2d 698], which held the commissioner's schedule of automobile property damage liability rates for 1971 unconstitutionally confiscatory. In that case the insurers pled detailed factual allegations of the effect of the rates and the commissioner did not dispute the allegations, but argued the case on the assumption of their correctness. (See p. 700.) The court's decision was based not on the face of the regulation, but upon "the facts alleged by the plaintiffs and admitted by the Commissioner." (P. 703.)

[7] See *City of Miami Beach* v. *Forte Towers, Inc.* (Fla. 1974) 305 So.2d 764, 765 (conc. opn. of Dekle, J., expressing the views of the court); *Cromwell Assocs.* v. *Newark* (1985) 211 N.J.Super. 462 [511 A.2d 1273]. Both decisions held invalid laws that permitted administrative bodies to approve rent increases, but limited the maximum that could be granted. The courts in both cases reasoned that under some circumstances a greater increase might be required to avoid confiscatory rates, and thus any absolute limit was facially unconstitutional.

Section 1861.01, subdivision (b), provides that "[b]etween November 8, 1988, and November 8, 1989, rates and premiums reduced pursuant to subdivision (a) may be only increased if the commissioner finds, after a hearing, that an insurer is substantially threatened with insolvency."[8] "Insolvency" has various meanings, but none will allow us to construe subdivision (b) to conform to the constitutional standard of a fair and reasonable return. ■ A company may be insolvent because it has more liabilities than assets, or because it is unable to pay its obligations as they fall due.[9] (See *Maryland Casualty Co.* v. *Commissioner of Insurance* (1977) 372 Mass. 554 [363 N.E.2d 1087, 1093-1094].) "Insolvency" is defined in the Insurance Code as "any impairment of minimum 'paid-in capital' . . . as defined in Section 36" (§ 985, subd. (a).) (Section 36 defines "paid-in capital" or "capital paid in," essentially as the excess of assets over liabilities. The statutory minimum for "paid-in capital" ranges from $500,000 to $1.3 million (§ 700.01).) ■ But under all of these definitions, a rate may be confiscatory even though it does not threaten the insurer's solvency.

The insolvency standard of section 1861.01, subdivision (b) refers to the financial position of the company as a whole, not merely to the regulated lines of insurance.[10] Many insurers do substantial business outside of Cali-

---

[8] Taken literally, the word "only" in subdivision (b) modifies "increased" and not the following phrase, so all the subdivision provides is that if an insurer is substantially threatened with insolvency, the commissioner can only increase its rates, not decrease them—and says nothing about companies not threatened with insolvency. We assume, however, as do all parties and amici curiae, that the subdivision was intended to permit a rate increase only if a company was substantially threatened with insolvency.

[9] If "insolvency" is defined as "bankruptcy," it is clear that rate relief cannot be confined to companies threatened with insolvency. In *Power Comm'n* v. *Hope Gas Co., supra,* 320 U.S. 591, 603 [88 L.Ed. at p. 345], the court said that in determining a fair rate of return, one must consider "the financial integrity of the company whose rates are being regulated. . . . [I]t is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. [Citation.] By that standard the return to the equity owner should be commensurate with returns on investment in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." Consequently when the Federal Energy Regulatory Commission argued that judicial review of rates was limited to companies threatened with bankruptcy, the court replied, "*Hope Natural Gas* talks not of an interest in avoiding bankruptcy, but an interest in maintaining access to capital markets, the ability to pay dividends, and general financial integrity. While companies about to go bankrupt would certainly see such interests threatened, companies less imminently imperiled will sometimes be able to make that claim as well. . . . The contention that no company that is not clearly headed for bankruptcy has a judicially enforceable right to have its financial status considered when its rates are determined must be rejected." *(Jersey Cen. Power & Light Co.* v. *F.E.R.C.* (D.C. Cir. 1987) 810 F.2d 1168, 1180.)

[10] Proponents point out that rates are generally regulated by considering each line of insurance separately, and suggest that "substantially threatened with insolvency" could be analyzed in a like manner. But subdivision (b) refers to the solvency of an "insurer," not a line of

fornia, or in lines of insurance within this state which are not regulated by Proposition 103. If an insurer had substantial net worth, or significant income from sources unregulated by Proposition 103, it might be able to sustain substantial and continuing losses on regulated insurance without danger of insolvency. In such a case the continued solvency of the insurer could not suffice to demonstrate that the regulated rate constitutes a fair return.[11]

The effect of section 1861.01, subdivision (b), is thus to bar safely solvent insurers from obtaining relief from "inadequate" rates until November 1989. Temporary rates which might be below a fair and reasonable level might compel insurers to return to their customers surpluses exacted through allegedly excessive past rates. But the concept that rates may be set at less than a fair rate of return in order to compel the return of past surpluses is not one supported by precedent. ■ "The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service. . . . [T]he law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future." (*Board of Comm'rs* v. *N.Y. Tel. Co., supra*, 271 U.S. 23, 31-32 [70 L.Ed. at p. 812]; accord, *American Toll Bridge Co.* v. *Railroad Com.* (1938) 12 Cal.2d 184, 203 [83 P.2d 1].) *Hutton, supra,* said that if past rents were excessive an ordinance could refuse to give landlords credit for current cost increases if the diminished rate of return was still just and reasonable. (350 A.2d at p. 16.) ■ But no case supports an unreasonably low rate of return on the ground that past profits were excessive.

Proponents urge that the insolvency standard can be sustained as a temporary or emergency measure. They point out that temporary freezes while administrative machinery is set up are commonly approved, even if they lack any method whereby a seller can get relief. (See, e.g., *Trans Alaska Pipeline Rate Cases* (1978) 436 U.S. 631 [56 L.Ed.2d 591, 98 S.Ct. 2053]; *United States* v. *SCRAP* (1973) 412 U.S. 669 [37 L.Ed.2d 254, 93 S.Ct. 2405]; *Western States Meat Packers Assn., Inc.* v. *Dunlop* (T.E.C.A. 1973) 482 F.2d 1401.) Most freezes are for periods of much less than one year, but courts have sustained freezes of a year or longer. (See, e.g., *Mass. Med. Society* v. *Comm'r of Ins.* (1988) 402 Mass. 44 [520 N.E.2d 1288] [two-year freeze on medical malpractice insurance rates].) The cases, however, pro-

---

insurance. One can speak of a line of insurance as unprofitable, or causing losses, but it would be strained usage to speak of it as threatened with insolvency.

[11] Respondents and proponents point out that subdivision (b) requires only that the insurer be "substantially threatened" with insolvency, not teetering on the brink. We agree that this standard gives the commissioner a measure of discretion, but it does not permit her to raise a confiscatorily low rate for a company in no danger whatever of insolvency.

ceed on the assumption that the frozen prices were those set by a seller in a competitive market, and thus were fair rates, so that the only concern is increased costs during the freeze. (See discussion in *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, 166.) Here we have a law which mandates not maintenance of a rate set by the seller, but a reduction to at least 20 percent less than former rates. The risk that the rate set by the statute is confiscatory as to some insurers from its inception is high enough to require an adequate method for obtaining individualized relief.

Proponents further argue that the insolvency standard in Proposition 103 was inserted to combat an emergency created by unavailable and unaffordable insurance. They assert that between 1983 and 1986 automobile insurance rates doubled, while commercial rates increased over 200 percent.[12] They observe also that in 1984 the Legislature enacted the Robins-McAlister Financial Responsibility Act (Stats. 1984, ch. 1322), requiring all motorists to purchase liability insurance and carry proof of financial responsibility.

We recognize that emergency situations may require emergency measures.[13] As the court explained in *Hutton,* a rent control case, "[t]he term 'confiscatory' must be understood in light of the surrounding circumstances. There are undoubtedly times of great public exigency during which landlords may temporarily be required to rent their property at rates which do not permit them to obtain what would ordinarily be considered a fair return." (350 A.2d at p. 13.) ■ Numerous cases confirm that measures enacted to combat an emergency of limited duration may be valid even though they do not guarantee a fair rate of return. (See *Bowles* v. *Willingham* (1944) 321 U.S. 503 [88 L.Ed. 892, 64 S.Ct. 641] [World War II rent control]; *Block* v. *Hirsh* (1921) 256 U.S. 135 [65 L.Ed. 865, 41 S.Ct. 458, 16 A.L.R. 165] [rent control after World War I]; *Whitney* v. *Heckler, supra,* 780 F.2d 963 [freeze on Medicare rates and rates charged non-Medicare patients, pursuant to Deficit Reduction Act of 1984]; *Western States Meat Packers Assn., Inc.* v. *Dunlop, supra,* 482 F.2d 1401 [price and wage controls under Economic Stabilization Act of 1970]; *Wilson* v. *Brown* (Emer.Ct.App. 1943) 137 F.2d 348 [price controls during World War II].)

■ To justify a measure which deprives persons of a fair return, however, "an emergency would have to be a temporary situation of such enor-

---

[12] Compare California Department of Insurance, One Hundred-Twentieth Annual Report of the Insurance Commissioner, Year Ending 1987, page 242, with California Department of Insurance, One Hundred-Seventeenth Annual Report of the Insurance Commissioner, Year Ending 1984, page 9.

[13] The doctrine that state price control laws are invalid except in an emergency was repudiated by this court in *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, 159. Hence we do not discuss the question of an "emergency" generally with respect to Proposition 103. That matter does become relevant, however, when the state, as in section 1861.10, subdivision (b), seeks to compel sellers to accept less than fair and reasonable rates.

mity that all individuals might reasonably be required to make sacrifices for the common weal." (*Hutton, supra,* 350 A.2d 1, 14.) We do not believe that the circumstances which inspired Proposition 103 meet this requirement. Our concern is not with the magnitude of the problem, but with its character. The asserted rise in insurance rates, rendering insurance unavailable or unaffordable to many, is not a temporary problem; it is a long term, chronic situation which will not be solved by compelling insurers to sell at less than a fair return for a year. Over the long term the state must permit insurers a fair return;[14] we do not perceive any short term conditions that would require depriving them of a fair return. We therefore conclude that section 1861.01, subdivision (b) cannot be sustained as an emergency measure fashioned to meet a temporary exigency.

Having determined that section 1861.01, subdivision (b), precludes adjustments necessary to achieve the constitutional standard of fair and reasonable rates, and that the subdivision cannot be sustained as a temporary or emergency measure, we hold it invalid under the due process clauses of the state and federal Constitutions. This holding requires us to determine whether the invalid provision is severable from the balance of the initiative.

Proposition 103 contains a severability clause which provides that "If any provision of this act or the application thereof to any person or circumstances is held invalid, that invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid portion or application, and to that end the provisions of this act are severable." Our cases explain the effect of such a clause. "Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment, especially when the invalid part is mechanically severable. . . . Such a clause plus the ability to mechanically sever the invalid part while normally allowing severability, does not conclusively dictate it. The final determination depends on whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of the legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable." (*Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 331 [118 Cal.Rptr. 637, 530 P.2d 605]; *Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180, 190 [185 Cal.Rptr. 260, 649 P.2d 902].) (Interior quotation marks and citations omitted.)

The cases prescribe three criteria for severability: the invalid provision must be grammatically, functionally, and volitionally separable. (See *Santa*

---

[14]*Hutton* noted that "[t]he existence of a chronic housing shortage of indefinite duration would not justify depriving property owners of a fair return for an indefinite period." (350 A.2d 1, 13-14.)

*Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d 315; *People's Advocate, Inc.* v. *Superior Court* (1986) 181 Cal.App.3d 316, 332 [226 Cal.Rptr. 640].) ■ Section 1861.01, subdivision (b), is clearly severable under these criteria.

First, the subdivision is mechanically and grammatically severable. It constitutes a distinct and separate provision of Proposition 103 which can be removed as a whole without affecting the wording of any other provision.

Second, the subdivision is functionally severable. Because it provides an exception to the more general rate-setting standard of section 1861.05, its removal merely eliminates the exception, permitting the general standard to operate from the effective date of the initiative.

Third, the remainder of the initiative, after deleting the insolvency standard, would likely have been adopted by the people had they foreseen the invalidity of the insolvency standard. The voters who enacted Proposition 103 would presumably prefer rate setting and regulation under the balance of the initiative to the method of setting insurance rates which existed before the initiative was enacted. There is no persuasive reason to suppose the insolvency standard was so critical to the enactment of Proposition 103 that the measure would not have been enacted in its absence.

We therefore conclude that section 1861.01, subdivision (b), although invalid, is severable. ■ The invalidation of this subdivision leaves untouched the general standard for rate adjustment set out in section 1861.05, subdivision (a). That provision states that "[n]o rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter. In considering whether a rate is excessive, inadequate or unfairly discriminatory, no consideration shall be given to the degree of competition and the commissioner shall consider whether the rate mathematically reflects the insurance company's investment income."

Petitioners raise no question of the constitutionality of rates set pursuant to that section. Its prohibition on excessive or inadequate rates echoes similar language in the laws of most states, as well as former section 1852 which it replaces. Since a confiscatory rate is necessarily an "inadequate" rate under the statutory language,[15] section 1861.05 requires rates within

---

[15]This construction is supported by the precept that "[i]f feasible within bounds set by their words and purpose, statutes should be construed to preserve their constitutionality." (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 175 [167 Cal.Rptr. 854, 616 P.2d 836]; see *Young* v. *Haines* (1986) 41 Cal.3d 883, 898 [226 Cal.Rptr. 547, 718 P.2d 909] and cases there cited.) But resort to canons of construction is hardly necessary here. That a "confiscatory" rate is an

that range which can be described as fair and reasonable and prohibits approval or maintenance of confiscatory rates.

As stated above, we have concluded that the standards set by section 1861.05, subdivision (a), govern rate regulation during the first year of the initiative's operation. We reach this conclusion because section 1861.05 contains no language limiting its operation to rates after November of 1989. Because such language appears in the good-driver provision (§ 1861.02), we infer from its absence from section 1861.05 that the latter section is not so limited. Many other provisions also contain no language delaying their effective date, and as to all of them the parties assume that they took effect November 8, 1988.

Additionally, the general rate-standard provision replaces a similar statute, former section 1852, which was repealed by Proposition 103. The former statute also prohibited inadequate, excessive, or unfairly discriminatory rates, but said that a rate in a competitive market could not be held excessive. ▮▮▮ When a statute replaces a prior statute, filling its function and adopting much of its wording, we would normally assume the new law takes effect upon the demise of its predecessor. This seems especially likely to have been the intent here, as otherwise there would be a one-year period in which no effective statute prohibited unfairly discriminatory rates.

Petitioners argue, however, that even if section 1861.05 provides a constitutionally valid standard for rate adjustment, insurers will be compelled to charge confiscatory rates pending administrative relief. They compare the procedures established by Proposition 103 with those in *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, where we invalidated a rent control ordinance because "the inexcusably cumbersome rent adjustment procedure" was "not reasonably related to [its] stated purpose of preventing excessive rents." (P. 173.)

The city ordinance at issue in *Birkenfeld* governed rents for about 22,000 units. (17 Cal.3d at p. 169.) No landlord could apply for a rent increase for

---

"inadequate" rate seems self-evident, and no one has advocated an alternative interpretation of the statutory language.

Former section 1852 provided that "[n]o rate shall be held to be inadequate unless (1) such rate is unreasonably low for the insurance provided and (2) the continued use of such rate endangers the solvency of the insurer using the same, or unless (3) such rate is unreasonably low for the insurance provided and the use of such rate by the insurer using same has, or if continued will have, the effect of destroying competition or creating a monopoly." This definition was written for a system in which insurers set their own rates, and an unreasonably low rate suggested either mismanagement or predatory intent. It is inappropriate for a system in which rates must be approved by the commissioner, and its repeal by Proposition 103 indicates that the drafters did not intend to confine "inadequacy" to cases of impending insolvency, monopoly, or destruction of competition.

any unit until he had obtained a certificate of compliance from the city building inspector. (P. 170.) Every application required a hearing, regardless of the size of the increase, the reason for the request, or the consent of the tenant. (P. 171.) The rent control board was required to hear each application personally; it could not consolidate applications or delegate the task to a hearing officer. (*Ibid.*) "In short, [the board was] denied the means of reducing its job to manageable proportions through the formulation and application of general rules, the appropriate delegation of responsibility, and the focusing of the adjudicative process upon issues which cannot fairly be resolved in any other way." (*Ibid.*)

We find no similar barriers to efficient decision making in Proposition 103. It does not establish a detailed method of processing and deciding rate applications. It contains a few provisions relating to public notice and participation (i.e., §§ 1861.05, subd. (c), 1861.06, 1861.07 & 1861.10), but hearings are generally held in accordance with provisions of the Administrative Procedure Act. (See § 1861.08, which provides generally that "[h]earings shall be conducted pursuant to Sections 11500 through 11528 of the Government Code.") ■■■ Much is necessarily left to the Insurance Commissioner, who has broad discretion to adopt rules and regulations as necessary to promote the public welfare. (*Credit Ins. Gen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651, 656 [128 Cal.Rptr. 881, 547 P.2d 993]; see *Garris* v. *Carpenter* (1939) 33 Cal.App.2d 649, 653 [92 P.2d 688].) Unlike *Birkenfeld, supra,* 17 Cal.3d 129, there are no prerequisites to the filing of an application for an increase. Increases of no more than 7 percent for personal lines, or 15 percent for commercial lines, are automatically granted without a hearing unless one is requested. The commissioner is expressly authorized to delegate hearings to administrative law judges. (§ 1861.08.) No provision bars the commissioner from consolidating cases or issuing regulations of general applicability. Thus there is nothing here which prevents the commissioner from taking whatever steps are necessary to reduce the job to manageable size. ■■■ It "is to be presumed that the [administrative agency] will exercise its power in conformity with the requirements of the Constitution; and if it does act unfairly, the fault lies with the [agency] and not the statute." (*Fisher* v. *City of Berkeley, supra,* 37 Cal.3d 644, 684, quoting *Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 149 [82 P.2d 434, 126 A.L.R. 838].)

Moreover, the commissioner has the power to grant interim relief from plainly invalid rates. ■■■ Her powers are not limited to those expressly conferred by statute; "rather, '[i]t is well settled in this state that [administrative] officials may exercise such additional powers as are necessary for the due and efficient administration of powers expressly granted by statute, or as *may fairly be implied* from the statute granting the powers.' " (*Rich*

*Vision Centers, Inc.* v. *Board of Medical Examiners* (1983) 144 Cal.App.3d 110, 114 [192 Cal.Rptr. 455], quoting *Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 810 [151 P.2d 505, 157 A.L.R. 324].) ■ ■ The power to grant interim relief is necessary for the due and efficient administration of Proposition 103, and may fairly be implied from its command that "[n]o rate shall . . . *remain in effect* which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter." (§ 1861.05, subd. (a).) (Italics added.)[16]

In short, any insurer who believes the rates set by section 1861.01, subdivision (a), are confiscatory may file an application with the Insurance Commissioner for approval of a higher rate. If that application is filed before November 8, 1989, the insurer may immediately begin charging that higher rate[17] pending approval from the commissioner. After that date insurance rates subject to Proposition 103 must be approved by the commissioner prior to their use, but, as we have explained, the commissioner can approve an interim rate pending her final decision. If the commissioner finds the initiative's rate, or some other rate less than the insurer charged, is fair and reasonable, the insurer must refund excess premiums collected with interest. No insurer, however, will be compelled to charge the rates set by the initiative unless it either acquiesces in that rate or is unable to prove that a higher rate is constitutionally required.[18] In view of these safeguards we conclude that the initiative provision requiring a reduction in rate to at least 20 percent below 1987 rates does not, on its face, violate the due process rights of insurers.

In summary, we have concluded (a) that section 1861.01, subdivision (b), limiting first-year-rate adjustments to insurers substantially threatened with insolvency, is facially invalid, but severable, and does not invalidate the remainder of the initiative; (b) that the procedures for adjustment of

---

[16] In the analogous area of public utility regulation, the commission's implied authority to grant interim increases has long been recognized. (See *Dyke Water Co.* v. *Public Utilites Com.* (1961) 56 Cal.2d 105, 110 [14 Cal.Rptr. 310, 363 P.2d 326]; *Saunby* v. *Railroad Commission* (1923) 191 Cal. 226, 230 [215 P. 904].)

[17] Proposition 103 provides that "insurance rates subject to this chapter must be approved by the commissioner prior to their use" (§ 1861.01, subd. (c)), but this provision takes effect November 8, 1989. Although the insolvency standard (§ 1861.01, subd. (b)) contemplated that during the first year of the initiative an insurer could not raise rates without a prior hearing, we have held this provision invalid. With its deletion, there remains no provision requiring prior approval of rate increases before November 8, 1989.

[18] Proposition 103 contemplates that any rate set by the commissioner will be subject to judicial review. (See § 1861.09.) At the time of any such review, the court will have before it an administrative record that will undoubtedly contain vital ratemaking information and the commissioner's evaluation of the impact of that rate on the insurer and the insureds. That record will make possible a more informed analysis of any claim that the rate set by Proposition 103 is confiscatory as to a particular insurer and line of insurance.

insurance rates—including application to the commissioner, the opportunity to seek interim relief, a hearing in accordance with the Administrative Procedure Act, and judicial review—meet constitutional standards; and (c) that in view of the safeguards described in this opinion, the rate rollback and reduction of Proposition 103 is not invalid on its face, but the rates thereby established are necessarily subject to the right of an insurer to demonstrate that a particular rate is, as applied to it, a confiscatory rate.

2. *Restrictions upon the insurers' right to refuse to renew policies.*

Proposition 103, in section 1861.03, subdivision (c) [hereafter nonrenewal provision], provides: "Notwithstanding any other provision of law, a notice of cancellation or non-renewal of a policy for automobile insurance shall be effective only if it is based on one or more of the following reasons: (1) nonpayment of premiums; (2) fraud or material misrepresentation affected the policy or insured; (3) a substantial increase in the hazard insured against." Before enactment of Proposition 103 insurers had an unfettered right to refuse to renew policies (see *Greene* v. *Safeco Ins. Co.* (1983) 140 Cal.App.3d 535, 538 [189 Cal.Rptr. 616]).[19]

Respondent Attorney General and proponents contend that the nonrenewal provision applies to policies issued before enactment of Proposition 103. Petitioners agree that the provision was intended to apply to policies in force when Proposition 103 was enacted but maintain that the application of this provision to such policies would in effect alter their terms, and thereby violate the constitutional prohibition against a "law impairing the obligation of contracts." (U.S. Const., art. I, § 10; see Cal. Const., art. I, § 9.) They do not contend that this subdivision is invalid as applied to policies voluntarily issued or renewed *after* November 8, 1988.[20] Amicus curiae Travelers Indemnity Company argues that the nonrenewal provision was not intended to apply to policies in force before enactment of Proposition 103, pointing to the well-established principle that regardless of considerations of constitutionality, "statutes are not to be given a retrospective operation unless it is clearly made to appear that such was the legislative intent." (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1207

---

[19] "Cancellation," as opposed to "non-renewal," refers to termination of a policy before its expiration date. Insurers' power to cancel policies was severely restricted by section 661 before enactment of Proposition 103. The only effect of Proposition 103 upon this section was to eliminate the 60-day grace period following issuance of a policy during which section 661 placed no limits on cancellation.

[20] Provisions similar to section 1861.03, subdivision (c), appear in the laws of many states, and as applied to policies issued after the effective date of the statute, have been sustained against constitutional attack. (See *Prudential Prop. & Cas. Co.* v. *Ins. Com'n* (D.S.C. 1982) 534 F.Supp. 571, 581; *Sheeran* v. *Nationwide Mut. Ins. Co., Inc.* (1979) 80 N.J. 548, fn. 2 [404 A.2d 625, 628].)

[246 Cal.Rptr. 629, 753 P.2d 585]; *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 393 [182 P.2d 159].)[21] Amicus curiae also contends that we should apply the well-established principle " 'that a court, when faced with an ambiguous statute that raises serious constitutional questions, should endeavor to construe the statute in a manner which *avoids* any doubt concerning its validity.' " (*Young* v. *Haines, supra,* 41 Cal.3d 883, 898; *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 147, 152 [197 Cal.Rptr. 79, 672 P.2d 862]; *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 948 [92 Cal.Rptr. 309, 479 P.2d 669].) We recognize the validity of these precepts, but conclude that the initiative's nonrenewal provision was intended to apply to existing contracts and that such application does not raise a substantial doubt respecting its constitutionality.

The nonrenewal provision contains no language limiting its effect to policies issued or renewed after November 8, 1988. The omission is significant, because section 1861.01 (the rate-rollback provision) expressly states that it applies only to policies "issued or renewed on or after November 8, 1988." The necessary inference is that the nonrenewal provision was not so limited.

The evident purpose of the nonrenewal provision, moreover, mandates its application to existing policies. The provision is obviously designed to give policyholders a measure of assurance that their coverage would continue, and to prevent widespread refusals to renew in response to the initiative's enactment. Accordingly, the conclusion is inescapable that the nonrenewal provision was intended to apply to policies in force on the effective date of Proposition 103.

We therefore turn to the question whether section 1861.03, if applied to existing policies, unconstitutionally impairs the obligation of contracts. Three relatively recent United States Supreme Court decisions have considered the impairment-of-contract clause.[22] In *Allied Structural Steel Co.* v.

---

[21] Travelers points to section 1861.11, which provides: "In the event that the commissioner finds that (a) insurers have substantially withdrawn from any insurance market covered by this article, including insurance described by Section 660 [automobile insurance], and (b) a market assistance plan would not be sufficient to make insurance available, the commissioner shall establish a joint underwriting authority in the manner set forth by Section 11891, without the prior creation of a market assistance plan." Under Proposition 103, however, an insurer retains the right to withdraw from the California market by surrendering its certificate pursuant to sections 1070-1076, as explained later in this opinion. (See *post,* p. 831.) Thus section 1861.11's reference to the possibility that insurers might withdraw from the market does not necessarily imply any distinction between policies issued before November 8, 1988, and those issued or renewed after that date.

[22] A fourth decision, *United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 21 [52 L.Ed.2d 92, 108-109, 97 S.Ct. 1505], involved a state statute repudiating the state's own contractual obligations. As later cases have made clear, such a law is subject to a more severe

*Spannaus* (1978) 438 U.S. 234 [57 L.Ed.2d 727, 98 S.Ct. 2716], the court struck down a Minnesota statute which required a company terminating operations in Minnesota to transfer to the state a sum sufficient to fund pension obligations to local workers. (Under prior law the company had the right to terminate the pension by refunding the trust amounts.) The court emphasized the narrow focus of the legislation—it was apparently aimed at only a few companies—and the fact that it concerned a subject not previously regulated.

*Energy Reserves Group* v. *Kansas Power & Light, supra,* 459 U.S. 400, upheld a Kansas law which established rates for natural gas sales and prohibited rate increases based on certain escalator clauses in existing contracts between gas sellers and public utilities. The court distinguished *Allied Structural Steel, supra,* 438 U.S. 234, primarily on the ground that the parties were operating in a heavily regulated industry.

The most recent decision, *Exxon Corp.* v. *Eagerton* (1983) 462 U.S. 176 [76 L.Ed.2d 497, 103 S.Ct. 2296], upheld an Alabama law which imposed a severance tax on oil and gas and prohibited price increases which would pass on the burden of the tax even though some sellers had contracts which expressly authorized such price increases. The decision explained that "[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.' [Citations.] This Court has long recognized that a statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment. [Citation.] . . . Thus, a state prohibition law may be applied to contracts for the sale of beer that were valid when entered into [citation], a law barring lotteries may be applied to lottery tickets that were valid when issued [citation], and workmen's compensation law may be applied to employers and employees operating under pre-existing contracts of employment that made no provision for work-related injuries. [Citation.] [¶] Like the laws upheld in these cases, the pass-through prohibition did not prescribe a rule limited in effect to contractual obligations or remedies, but instead imposed a generally applicable rule of conduct designed to advance 'a broad societal interest,' [citation]: protecting consumers from excessive prices. The prohibition applied to all oil and gas producers, regardless of whether they happened to be parties to sale contracts that contained a provision permitting them to pass tax increases through to their purchasers. The effect of the pass-through prohibition . . . was incidental to its main

standard than are laws which primarily affect private obligations. (See *Energy Reserves Group* v. *Kansas Power & Light* (1983) 459 U.S. 400, 412-413 [74 L.Ed.2d 569, 581, 103 S.Ct. 697].)

effect of shielding consumers from the burden of the tax increase." (462 U.S. at pp. 190-192 [76 L.Ed.2d at pp. 510-511].)[23]

None of the United States Supreme Court cases has considered the contract clause in connection with insurance regulation, but a number of lower court decisions have discussed this matter.[24] *Hinckley* v. *Bechtel Corp.* (1974) 41 Cal.App.3d 206 [116 Cal.Rptr. 33] involved a law which limited the period during which a retiring employee could exercise his right to convert a group life insurance policy to an individual policy without proof of insurability. Holding that the law could be applied to existing policies, the Court of Appeal stated: "The cases are legion which hold that the police power of the state to regulate insurance business cannot be contracted away, and the economic interest of the state may justify the exercise of its continuing protective power notwithstanding interference with existing contracts." (P. 215.)

Decisions of other states also offer an analogy. *Smith* v. *Department of Insurance, supra,* 507 So.2d 1080, offers something for both sides. Florida passed a law which limited noneconomic tort damages, froze insurance rates, required a partial rebate of premiums on existing policies, and prohibited insurers from cancelling or refusing to renew existing policies in order to avoid the rate freeze or rebate. The court held the rebate provision unconstitutional, applying a Florida rule that "virtually no degree of contract impairment is tolerable in this state." (*Pomponio* v. *Claridge of Pompano Condominium, Inc.* (Fla. 1979) 378 So.2d 774, 780, cited in *Smith, supra,* 507 So.2d at p. 1094.) But it upheld without discussion all other provisions relating to insurance policies, including the section limiting the insurers' right to refuse to renew policies.

The State of Massachusetts, after regulating insurance rates for many years, discontinued rate regulation as of January 1, 1977. When insurance rates rose rapidly, the state legislature reimposed regulation retroactive to January 1, directed that all policies written since January 1 be rewritten at reduced rates, and excess premiums rebated. In *American Mfrs. Mut. Ins. Co.* v. *Comm'r of Ins., supra,* 372 N.E.2d 520, the Supreme Judicial Court of Massachusetts upheld the statute. The court relied on the urgent need for

[23] Professor Tribe suggests that *Exxon Corp., supra,* 462 U.S. 176, and *Energy Reserves, supra,* 459 U.S. 400, are inconsistent with, and effectively overrule, *Allied Structural Steel, supra,* 438 U.S. 234. (Tribe, American Constitutional Law (2d ed. 1988) §§ 9-11.)

[24] Rent control ordinances limiting a landlord's right to increase the rent under existing tenancies or to evict existing tenants were upheld as long ago as *Block* v. *Hirsh, supra,* 256 U.S. 135 and *Marcus Brown Co.* v. *Feldman* (1921) 256 U.S. 170 [65 L.Ed. 877, 41 S.Ct. 465]. (See *Lopez* v. *Mirabel* (1987) 127 App.Div.2d 771 [512 N.Y.Supp.2d 164]; cf. *Edgewater Inv. Assoc.* v. *Borough of Edgewater* (1986) 103 N.J. 227 [510 A.2d 1178, 1185] [condominium conversion ordinance].)

immediate correction of insurance rates, and reasoned that insurers, as part of an intensely regulated industry, "were on notice that the premiums received were not firm against legislative adjustment." (P. 528.)

When New York enacted no-fault insurance in 1973, it required insurers to offer that coverage to existing policyholders, and imposed a three-year restriction on nonrenewal of policies. In *County-Wide Ins. Co.* v. *Harnett* (S.D.N.Y. 1977) 426 F.Supp. 1030, 1035, a three-judge federal court upheld a law extending the restriction for an additional three years, stating that "[t]he law accomplishes a legitimate public goal and any contract rights must yield to it."[25]

We now apply these principles and precedents to the renewal provision of Proposition 103. We begin by assessing the severity of the impairment, since that assessment "measures the height of the hurdle the state legislation must clear" (*Allied Structural Steel* v. *Spannaus, supra,* 438 U.S. 234, 245 [57 L.Ed.2d at p. 737]), then examine the public interest advanced to justify the impairment.

In the present case the impairment, while not so low as to escape constitutional scrutiny, is relatively moderate and restrained, and the hurdle correspondingly low. The insurer may still refuse to renew policies for nonpayment of premium, fraud or misrepresentation, or substantial increase in the hazard insured against. And when it renews pursuant to Proposition 103 it is guaranteed fair and reasonable rates.

Insurance, moreover, is a highly regulated industry, and one in which further regulation can reasonably be anticipated.[26] ■ As we said in *Carpenter* v. *Pacific Mut. Life Ins. Co.* (1937) 10 Cal.2d 307 [74 P.2d 761]: "It is no longer open to question that the business of insurance is affected with a public interest. . . . Neither the company nor a policyholder has the inviolate rights that characterize private contracts. The contract of the policyholder is subject to the reasonable exercise of the state's police power." (P. 329; see *People* v. *United National Life Ins. Co.* (1967) 66 Cal.2d

---

[25] One decision has reached a contrary result. In *Health Ins. Ass'n of America* v. *Harnett* (1978) 44 N.Y.2d 302 [376 N.E.2d 1280] the court held that a law requiring health insurers to offer maternity coverage could not constitutionally be applied to existing health insurance policies. The decision rests on a view of state power far more limited than appears in the California cases, that "[o]nly on rare occasions and in extreme circumstances do rights fixed by the terms of a contract willingly entered into give way to a greater public need." (376 N.E.2d 1280, 1287.)

[26] In *California Auto Assn.* v. *Maloney* (1951) 341 U.S. 105, 109-110 [95 L.Ed. 788, 792-793, 71 S.Ct. 601], the Supreme Court spoke of the "special relationship" between government and the insurance industry as justifying more extensive regulation than might be permitted for other industries.

577, 595 [58 Cal.Rptr. 599, 427 P.2d 199] and cases there cited.) ▮▮ Indeed it is clear that during the year prior to November 8, 1988—a year during which almost all automobile insurance policies in effect on that date were issued or renewed—insurers were well aware of the possibility that initiatives or ordinary legislation might be enacted that would affect existing polices.

Finally, Proposition 103 does not prevent an insurer from discontinuing its California business. Sections 1070 through 1076 spell out the procedure by which an insurer may withdraw from California by surrendering its certificate of authority. The initiative did not repeal those sections, and indeed recognizes the possibility that insurers may withdraw from some insurance markets by authorizing the commissioner to establish a joint underwriting authority to serve such markets. (§ 1861.11, quoted in fn. 21, *ante.*)

We turn now to examine the public interest to determine whether it justifies the impairment. As we noted earlier, the drafters and the voters were evidently concerned that the enactment of Proposition 103 might cause some insurers not to renew some or all of their existing policies, an action which would undermine Proposition 103's goal of making insurance "available" for all Californians. Indeed if many insurers refused to renew the state could face a crisis in which many of its residents would be unable to obtain insurance and thus could not legally drive, and others would be forced to accept inadequate protection. We conclude that the public interest in averting this danger, when measured against the relatively low degree of impairment of contract rights involved, is sufficient to justify Proposition 103's nonrenewal provision, and accordingly that this provision can be applied to existing policies without violating the state or federal Constitutions.

3. *Notice of formation of a consumer-advocacy corporation.*

Section 1861.10, subdivision (c), provides for the creation of a consumer-advocacy corporation, and notice to all California policyholders of their opportunity to become members of the corporation. It reads in full as follows: "(1) The commissioner shall require every insurer to enclose notices in every policy or renewal premium bill informing policyholders of the opportunity to join an independent, non-profit corporation which shall advocate the interests of insurance consumers in any forum. This organization shall be established by an interim board of public members designated by the commissioner and operated by individuals who are democratically elected from its membership. The corporation shall proportionately reimburse insurers for any additional costs incurred by insertion of the enclosure,

except no postage shall be charged for any enclosure weighing less than ⅓ of an ounce. (2) The commissioner shall by regulation determine the content of the enclosures and other procedures necessary for implementation of this provision. The legislature shall make no appropriation for this subdivision."

Petitioners contend that the foregoing provision violates article II, section 12 of the California Constitution, which states: "No amendment to the Constitution, and no statute proposed to the electors by the Legislature or by initiative, that names an individual to hold any office, or names or identifies any private corporation to perform any function or to have any power or duty, may be submitted to the electors or have any effect." Petitioners further argue that since the constitutional provision says that no statute which violates it "may . . . have any effect," the invalid language is nonseverable and invalidates the whole of Proposition 103. We hold that the consumer-advocacy provision of Proposition 103 does violate article II, section 12, but is severable and does not affect the balance of the initiative.

The explicit terms of article II, section 12, demonstrate that the consumer advocacy provision of Proposition 103 is invalid. The constitutional prohibition bars naming or identifying a private corporation to perform any function. The consumer-advocacy provision "identifies" a particular corporation—that one which is to be formed by an interim board of public members appointed by the Insurance Commissioner. As we explain later in this opinion, the corporation to be formed is a private corporation. Finally, that corporation is identified to perform a "function," to "advocate the interests of insurance consumers in any forum." (§ 1861.10, subd. (c).) We see no escape from the clear and explicit language of the state Constitution.

In arguing to the contrary, the proponents of the initiative and the Attorney General rely on the history and purpose of article II, section 12. That section is an amalgam of two constitutional provisions enacted to prevent the initiative from being used to confer special privilege or advantage on specific persons or organizations.

The first such provision, enacted in 1950, was a response to two initiatives on the 1948 ballot. One proposed, among many other things,[27] to establish a California Pension Commission of five commissioners with six-year terms of office, and to name the persons to hold those offices. The other designated a specific individual to be Director of the State Department of Social Welfare.

---

[27] This court issued mandamus to strike the measure from the ballot on the ground that it proposed so many and so sweeping changes that it constituted a revision of the state Constitution, which could only be done by a constitutional convention. (*McFadden* v. *Jordan* (1948) 32 Cal.2d 330 [196 P.2d 787].)

Seeking to exclude such provisions from future initiatives, the Legislature submitted to the voters a proposed constitutional amendment providing that any initiative statute or constitutional amendment "which names any individual . . . to hold any office" shall have no effect. (Former art. IV, § 1d.) The voters adopted the measure at the 1950 election.

The second provision was enacted in 1964. In that year a private corporation, the American Sweepstakes Corporation, financed a proposed constitutional amendment establishing a state lottery and designating the sponsoring corporation as administrator of the lottery. The Legislature countered by putting a constitutional amendment on the same ballot specifying that any amendment "which names any private corporation . . . to have any power or duty" shall have no effect. (Former art. IV, § 1d, subd. (b).) Significantly the Legislature considered, but rejected, limiting this prohibition to profit-making corporations. (See Assem. Const. Amend. No. 12 (1964 First Ex. Sess.).) The voters defeated the lottery, but approved the prohibition on amendments which name private corporations.

In 1966 the Constitution Revision Commission combined the two measures into a single provision which prohibited the naming or identifying of a person or private corporation in a constitutional amendment or initiative. The 1966 revision made two significant changes: it added a prohibition against "identifying" as well as "naming" persons or corporations, and it extended the prohibition on naming or identifying corporations (which under the 1964 enactment applied only to constitutional amendments) to encompass initiative legislation. The voters approved the 1966 revision, adopted as article IV, section 26, and since renumbered as article II, section 12.

Citing this historical record, proponents and the Attorney General contend that the constitutional prohibition applies only to existing corporations. To be sure, the American Sweepstakes Corporation, whose actions provoked the 1964 amendment, was an existing corporation. The evil which the constitutional prohibition seeks to prevent—the conferring of special privilege upon some organization sponsoring the initiative—is most easily perpetrated by referring to an existing entity. But if the prohibition were limited to existing entities, it could readily be evaded by conferring a privilege upon some future corporation, describing its formation and governance so as to ensure its control by the proponents of the initiative.

It is further contended that the proposed consumer-advocacy corporation would not be a "private" corporation within the meaning of article II, section 12. The parties agree that the corporation envisioned by Proposition 103 would probably be classified as a "nonprofit public benefit corporation"

under Corporations Code section 5110 et seq. This category covers nonreligious corporations whose assets are irrevocably dedicated to charitable or public purposes and which, upon dissolution, must be distributed to some other person or corporation carrying on similar purposes.

To hold that a "nonprofit public benefit corporation" is generally exempt from the prohibition of article II, section 12 would confine that prohibition primarily to corporations organized for profit, contrary to the intent of the 1964 Legislature in proposing the predecessor of the present constitutional prohibition. We recognize that Proposition 103's consumer-advocacy corporation differs in one respect from a typical nonprofit public benefit corporation; it will be established by "an interim board of public members designated by the commissioner." (§ 1861.10, subd. (c).) The Insurance Commissioner is a public officer and a corporation managed by persons she selects is arguably a public corporation. The authority of the commissioner's appointees, however, is limited to the establishment of the corporation; it is governed thereafter by "individuals who are democratically elected from its membership." (*Ibid.*) Thus in operation the consumer-advocacy corporation will be governed by its members, much like other nonprofit corporations.[28] We conclude that it must be classified as a private corporation under article II, section 12.

We reject the contention that the inclusion of nonprofit corporations is inconsistent with the purpose of the constitutional prohibition. It may be less likely that promoters seeking self-aggrandizement would employ a nonprofit corporation as a vehicle, but we still perceive a danger that supporters of a particular nonprofit organization might seek to obtain through the initiative some special privilege not afforded other organizations. One might even perceive this danger in the present case. There are several consumer-advocacy corporations, and others could be formed. But Proposition 103 gives a kind of state imprimatur to one particular corporation—the one formed pursuant to section 1861.10, subdivision (c)—and gives that organization alone the benefit of a low-cost or free statewide mailing to solicit memberships.

Finally, proponents and the Attorney General contend that article II, section 12, was intended to prevent private persons or corporations from being granted a constitutional right to a public office or function. They

---

[28]*State Bar* v. *Superior Court* (1929) 207 Cal. 323, 332 [278 P. 432], held that the California State Bar is a public corporation. Our recent opinion in *Keller* v. *State Bar* (1989) 47 Cal.3d 1152, 1162-1164 [255 Cal.Rptr. 542, 767 P.2d 1020], describes the extensive network of legislative regulation of the bar which sets it off from ordinary private associations and led us to decide that the bar was more closely analogous to a governmental agency. No similar provisions apply to Proposition 103's consumer-advocacy corporation.

therefore claim that section 12 of article II should be construed to prohibit identifying a corporation only if the initiative describes that corporation as performing a *public* function. We find no such limiting language in the constitutional provision itself. Moreover, the function to be performed by the consumer-advocacy corporation is in a sense a public function, that of representing consumers in ratemaking proceedings before the Insurance Commissioner, thereby assuring that the commissioner's decisions are based upon a truly adversary process in which the interests of both insurers and consumers are presented.

We conclude that Proposition 103, in section 1861.10, subdivision (c), impermissibly identifies a private corporation to perform a function, in violation of article II, section 12, of the California Constitution.[29] We therefore turn to petitioners' contention that because article II, section 12, provides that "no statute proposed to the electors . . . by initiative" that identifies a private corporation to perform a function "may be submitted to the electors or have any effect," the consumer-advocacy provision is not severable, and the entire initiative invalid.

Petitioners compare article II, section 12, to the single-subject rule (art. II, § 8), which states in subdivision (d) that "[a]n initiative measure embracing more than one subject may not be submitted to the electors or have any effect." In *California Trial Lawyers Assn.* v. *Eu* (1988) 200 Cal.App.3d 351, 362 [245 Cal.Rptr. 916], the court held that this language "preclude[s] judicial surgery to cure single-subject violations. . . . [I]t unambiguously states that an initiative encompassing more than one subject shall have no effect. Its wording defies a construction that only some parts shall be denied effect."

The single-subject rule, however, differs critically in both language and purpose from article II, section 12. Article II, section 8, says that "[a]n initiative measure" which violates the single-subject rule may not be submitted to the voters or have any effect. Article II, section 12, says that a "statute" which violates that provision may not be submitted to the voters or have any effect. The term "initiative measure" is the broader term, for an initiative measure may, and commonly will, contain more than one statute. Proposition 103 itself adds numerous statutes to the Insurance Code, one section to the Revenue and Taxation Code, and repeals other statutes. Thus the language of article II, section 12 requires us only to invalidate the offending statute, that is, section 1861.10, subdivision (c), and not the balance of the initiative.

---

[29] It bears emphasis that our holding is a narrow one. Article II, section 12, limits only the power of the voters, not the Legislature. The Legislature remains free to adopt measures to provide for consumer representation in proceedings before the commissioner or elsewhere.

The difference in purpose of the two provisions leads to the same conclusion. An initiative which violates the single-subject rule contains two or more portions which could be separately enacted, but cannot be combined in one measure. A court finding such a violation has no method of deciding which part of the initiative shall take effect. In contrast, when a part of an initiative violates article II, section 12, the rule is clear: the offending part must be stricken from the initiative, and the remainder may take effect.

We conclude that article II, section 12, precludes severability only within the confines of the particular statute which impermissibly names or identifies a person or private corporation. The question whether the statute can be severed from the balance of the initiative must be determined by the general principles of severability set out earlier in this opinion (see *ante,* pp. 821-822).

 Under these principles it is clear that the consumer-advocacy provision is severable. Section 1861.10, subdivision (c) is mechanically and functionally independent of the balance of the measure. The only question is whether that subdivision meets the third criterion for severance: whether the initiative would have been adopted had the voters foreseen the invalidity of the consumer-advocacy provision.

The consumer-advocacy provision is clearly not essential to the initiative's purpose and structure. Petitioners, however, maintain that Proposition 103 might not have been enacted without such a provision. They point to proponents' ballot argument which said that Proposition 103 "specifies that a permanent, independent consumer watchdog system will champion the interests of insurance consumers." The ballot argument went on to distinguish rival Proposition 100 on the ground that it did not "enable consumers to permanently unite to fight against insurance abuse."[30] Petitioners suggest that this argument may have led the voters to adopt Proposition 103 instead of Proposition 100, and thus that Proposition 103 might not have been enacted without a consumer-advocacy provision. But we are in no position to undertake a factual inquiry into whether this portion of the ballot argument persuaded any voter to support Proposition 103 instead of Proposition 100. (Some voters undoubtedly supported both.) The test of severability is one based on reason, and it stands to reason that voters who favored a measure that provides for public regulatory hearings with consumer participation would still favor that measure had they foreseen the invalidity of the provision creating a particular corporation to represent the

---

[30] Proposition 100 also proposed to regulate liability insurance rates, but differed from Proposition 103 in a variety of respects. One provision in Proposition 100 provided that consumers were to be represented by a division of the Attorney General's office.

consumers. (See *Santa Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d 315, 331.)

4. *Board of Equalization adjustment of premium tax rates.*

California imposes a gross premium tax upon insurers in lieu of most other taxes. (Cal. Const., art. XIII, § 28.) The Constitution sets a rate of 2.35 percent (*id.*, subd. (d)), subject to legislative alteration (*id.,* subd. (i)). The Legislature has established various rates pursuant to this authority, but currently imposes a tax at the same rate (2.35 percent) as specified by the Constitution. (See Rev. & Tax. Code, § 12202.)

Anticipating that ratemaking and adjustment under Proposition 103 might affect revenue collected under the gross premium tax, the drafters of Proposition 103 included a transitional provision which added section 12202.1 to the Revenue and Taxation Code. It provides: "Notwithstanding the rate specified by Section 12202, the gross premium tax rate paid by insurers from any premiums collected between November 8, 1988 and January 1, 1991 shall be adjusted by the Board of Equalization in January of each year so that the gross premium tax revenues collected for each prior calendar year shall be sufficient to compensate for changes in such revenues, if any, including changes in anticipated revenues, arising from this act. In calculating the necessary adjustment, the Board of Equalization shall consider the growth in premiums in the most recent three year period, and the impact of general economic factors including, but not limited to, the inflation and interest rates."[31]

Petitioners contend that Revenue and Taxation Code section 12202.1 is invalid on three grounds: (1) that article XIII, section 28, by granting the Legislature the authority to alter the tax rate set in the Constitution, impliedly excludes the use of the initiative; (2) that article XIII A, section 3, either bars tax increases by initiative or requires that any such measures be approved by two-thirds of the voters; and (3) that section 12202.1 unlawfully delegates legislative power to the Board of Equalization. The Attorney General, Board of Equalization, and State Controller (as amicus curiae) argue in response that article XIII, section 32's ban on suits to enjoin the collection of a tax precludes us from considering petitioners' contentions until they have actually paid a tax levied under Revenue and Taxation Code section 12202.1.

---

[31] Revenue and Taxation Code section 12202.1 requires the Board of Equalization, taking account of the tax rate set by the Legislature, to adjust that rate to compensate for the effect of Proposition 103. Although it is not entirely clear, we do not interpret section 12202.1 to preclude legislative action changing the rate itself.

■ We conclude that article XIII, section 32, generally bars prepayment review of tax measures, and that the circumstances of this case do not justify an exception to that rule. Proposition 103's tax adjustment provision is severable from the balance of the initiative, so any postpayment decision on its validity will not affect the remainder of the initiative.

Article XIII, section 32, states: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature." This language—"prevent or enjoin"—bars not only suits for injunctive relief, but also actions for declaratory relief or mandamus. (*Pacific Gas & Electric Co. v. State Board of Equalization* (1980) 27 Cal.3d 277, 280-281 [165 Cal.Rptr. 122, 611 P.2d 463] and cases there cited.) Thus when public utilities sued to compel the Board of Equalization to adjust an assessment because it violated article XIII A of the state Constitution, we replied that "section 32 means what it says. Nothing in the policy underlying the section, its history, or the cases construing it, would support an exception on the ground here claimed." (27 Cal.3d at p. 284.)

This is, moreover, a particularly unsuitable case for prepayment determination of the validity of a tax measure. We should not reach constitutional issues unnecessarily, and those presented by petitioners are particularly difficult, with implications going far beyond the present case. Furthermore, the parties have argued the matter on the assumption that rates will be reduced as provided in section 1861.01, with relief only for companies threatened with insolvency. Our opinion, however, invalidates the insolvency standard and authorizes insurers during the initiative's first year to put rate increases into effect immediately after filing an application with the commissioner. These rulings necessarily create uncertainty about the extent to which insurance premiums will in fact be reduced below projected levels—an uncertainty which will only be resolved when the commissioner reviews insurers' rate applications. Moreover, to the extent that Proposition 103 does reduce rates, it may lead more people to buy insurance, thereby increasing the tax base. Consequently it is possible that the issues petitioners raise may never have to be decided, since the Board of Equalization may find it unnecessary to adjust the premium tax.

Petitioners seek to find exceptions to the prohibition of article XIII, section 32 in the language of our recent opinion in *Western Oil & Gas Assn. v. State Board of Equalization* (1987) 44 Cal.3d 208 [242 Cal.Rptr. 334, 745 P.2d 1360]. The taxpayer in that case objected to a Board of Equalization discovery order, claiming that compelled disclosure constituted an unrea-

sonable search and seizure under the federal Constitution because the underlying tax assessment was invalid. We recognized that "[t]he ban on prepayment judicial review found in the state Constitution must yield, of course, to the requirements of the federal Constitution." (P. 213.) Since the federal courts permitted prepayment relief in "those situations in which it is clear that ' "under no circumstances" can the government prevail' " (p. 214; see *Enochs* v. *Williams Packing Co.* (1962) 370 U.S. 1, 7 [8 L.Ed.2d 292, 296-297, 82 S.Ct. 1125]), we adopted that same standard for state prepayment suits asserting federal constitutional issues.[32]

In the present case, unlike *Western Oil & Gas, supra,* 44 Cal.3d 208, petitioners are not claiming any action of the Board of Equalization would constitute an unreasonable search or seizure; indeed their challenges to the tax provision are not based on the federal Constitution at all but raise only state constitutional issues. With respect to such claims, there is nothing in *Western Oil & Gas* which would suggest that the state constitutional ban on prepayment review should "yield" at all. The exception to that ban recognized in *Western Oil & Gas* goes only as far as federal constitutional considerations require. To extend it to state claims, as petitioners seek, would permit taxpayers to obtain prepayment review of tax measures simply by alleging that the tax is not only invalid, but so clearly invalid that under no circumstances could the government prevail.

Petitioners argue for a second exception to article XIII, section 32. Quoting *Western Oil & Gas,* where we said that "section [32] applies if the prepayment judicial determination sought would impede tax collection" (44 Cal.3d at p. 213), they assert that since no tax rate has yet been set by the Board of Equalization, review now would not impede tax collection.

Proposition 103 provided for a reduction in insurance premiums as of November 8, 1988, and an adjustment in the premium tax rate in January of 1989. The reason no adjustment occurred is because this court stayed the premium reductions, thus removing the predicate for changes in the premium tax rate. Absent that stay, taxes would have been assessed in January of 1989, and petitioners' attempt to obtain prepayment review would clearly be seen to impede tax collection. We do not believe the application of article XIII, section 32 depends on such procedural fortuities. It would open an obvious loophole in the ban on prepayment suits to permit such a suit

---

[32] When we examined the taxpayers' claim in *Western Oil & Gas,* we concluded that the Board of Equalization's 46 years of apparent acquiescence in an interpretation favoring the taxpayer "may be ground for questioning its present course, but we are not prepared to rule its present interpretation so devoid of merit or so lacking a basis in law and fact that 'under no circumstances' could the Board prevail." (44 Cal.3d at p. 215.) This holding illustrates the extremely narrow scope of the federal exception to the rule barring prepayment suits.

whenever the taxpayer can combine a request to stay collection of a tax with a request to stay some condition precedent to collection.

Finally, implicit in petitioners' contentions is a third possible exception to the constitutional prohibition on prepayment review. Petitioners contend that Proposition 103's tax adjustment provision is not only invalid, but nonseverable, an argument which implies that we must adjudicate the validity of Revenue and Taxation Code section 12202.1 before we can uphold the validity of any other part of the initiative. We have concluded, however, that section 12202.1, whether valid or not, is severable from the balance of the measure.

We previously discussed the severability of other portions of Proposition 103, and noted that an invalid provision is severable if it meets three criteria: grammatical, functional, and volitional. (*Ante,* pp. 821-822, and 836.) The tax adjustment provision clearly meets the first two criteria; it is a separate, discrete provision whose removal does not affect the operation of any other provision.

Petitioners contend that Revenue and Taxation Code section 12202.1 fails the third criteria because the voters would not have adopted the remainder of the initiative had they foreseen its invalidity. They point to the ballot pamphlet analysis by the Legislative Analyst, which said "[t]he rate reductions and the good driver discounts combined normally would reduce state insurance tax revenues by about $125 million a year. . . . The resulting state revenue loss, however, will not occur because this measure provides that for the period November 1988 to January 1991 the State Board of Equalization shall adjust the state tax rate on gross premiums to offset these premium reductions." Petitioners argue that some voters who supported Proposition 103 would have voted against it if they were informed that Revenue and Taxation Code section 12202.1 was invalid, and thus that the measure might cost the state treasury $125 million.[33]

Proposition 103 was enacted to make insurance more available and affordable, not to increase or stabilize revenues. The ballot arguments center on its effect on insurance, and do not refer to the tax adjustment provision.[34]

---

[33] The $125 million figure, however, assumed that no insurer would succeed in obtaining relief from the rates set by Proposition 103. (It also assumed a rate reduction in excess of 20 percent would neither lead any presently uninsured persons to buy insurance nor any presently insured persons to increase their coverage.) Our holding invalidating the insolvency standard, and our conclusion that until November 1989 insurers may increase rates upon the filing of an application, render this assumption questionable. It is unclear whether the portion of Proposition 103 upheld in this case will result in any revenue loss, but any such loss may not be as great as the Legislative Analyst's figure.

[34] Proponents point to the statement in Proposition 103 that "this reform will cost the taxpayers nothing" (Ballot Pamp., Prop. 103 (Nov. 8, 1988) § 1, p. 99) and the statement in pro-

The deletion of that provision will not hamper the achievement of the initiative's stated purpose, and it is unlikely that any significant proportion of its supporters would be deterred by the possibility that its enactment might have a small but uncertain effect on revenues.[35] In *Santa Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d 315, we upheld the remainder of an initiative, after severing the invalid portion, on the ground that "it seems eminently reasonable to suppose that those who favor the proposition would be happy to achieve at least some substantial portion of their purpose." (P. 332.) Here the removal of Revenue and Taxation Code section 12202.1 permits the supporters to achieve all of their stated objectives. We find it reasonable to conclude that the voters would favor enactment of a measure which provides for a reduction in current insurance rates and regulation of future rates, even if it might have a small and uncertain effect on revenues. Revenue and Taxation Code section 12202.1 is therefore severable from the remainder of the proposition. If it were later held invalid, that holding would not affect the validity of the rest of the initiative.

5. *The single-subject rule.*

Article II, section 8, subdivision (d) of the California Constitution provides that "[A]n initiative measure embracing more than one subject may not be submitted to the electors or have any effect." ▮▮▮ Petitioners do not claim that Proposition 103 violates this requirement, but that contention is raised by intervener Association of California Life Insurance Companies as well as by several amici curiae. Intervener argues that section 7 of the initiative, which repeals laws that (a) prohibit rebates to consumers and (b) bar banks from selling insurance, will not further the goals of the initiative, and thus involve a different "subject" than the balance of the initiative.

It is apparent that one could reasonably believe that allowing insurance agents to give rebates to customers and permitting banks to compete in selling insurance will lower the cost of insurance. It may be that such beliefs are naive, as intervener claims, and that in fact the provision will have an opposite effect. ▮▮▮ But we do not review initiatives by attempting to predict whether each section actually will further the initiative's purpose. Instead, we inquire only whether the provisions are "reasonably germane"

---

ponents' rebuttal argument that "103 will actually save money for taxpayers," but neither refers to Revenue and Taxation Code section 12202.1. The first, in context, refers to the costs of administering the initiative; the full sentence reads "[i]nsurance companies shall pay a fee to cover the costs of administering these new laws so that this reform will cost the taxpayers nothing." The second statement refers to proponents' claim that the proposition will reduce the cost of insurance to municipalities and other governmental agencies.

[35] Since the premium tax rate is 2.35 percent, every $1 decline in gross premium tax revenue implies that insureds have saved $42.55 in insurance premiums.

to the general purpose or objective of the initiative. (*Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078, 1098 [240 Cal.Rptr. 569, 742 P.2d 1290] and cases there cited.) All of the provisions of Proposition 103 relate generally to the cost of insurance or the regulation thereof, and all (including those of which intervener complains) at least arguably will help to achieve the goal of making insurance more affordable and available. We therefore find no violation of the single-subject rule.

### 6. *Conclusion.*

We hold that the insolvency standard, section 1861.01, subdivision (b), on its face violates the due process clauses of both state and federal Constitutions. The consumer-advocacy provision, section 1861.10, subdivision (c), violates article II, section 12, of the California Constitution. We do not determine the validity of the tax adjustment provision, Revenue and Taxation Code section 12202.1. All of these provisions are severable. In light of the safeguards described in this opinion, the remainder of Proposition 103 is facially constitutional.

The petition for a peremptory writ of mandate is granted to the extent that it seeks to compel respondents to refrain from enforcing sections 1861.01, subdivision (b) and 1861.10, subdivision (c). In all other respects the petition is denied. The parties shall bear their own costs.

Lucas, C. J., Mosk, J., Panelli, J., Eagleson, J., Kaufman, J., and Arguelles, J.,* concurred.

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.