Steven V. Berson Executive Director Colorado Department of Regulatory Agencies 1525 Sherman Street, Room 110 Denver, CO 80203
Dear Mr. Berson:
This opinion letter is in response to your August 15, 1989 letter in which you ask six questions concerning the Insurance Division's powers to regulate automobile insurance premiums and insurance company underwriting guidelines.
QUESTIONS PRESENTED AND CONCLUSIONS
Your letter raises the following six questions:
1. Can the Division of Insurance require insurance companies across the board to cut automobile insurance rates by 20 percent?
No.
2. Can the Division of Insurance require that all insurance companies not raise automobile insurance premium rates for 2 years?
No.
3. Can the Division of Insurance require that all insurance companies receive prior approval from the Division of Insurance before they raise automobile insurance rates?
Yes.
4. Can the Division of Insurance mandate an end to penalties such as increased premium rates or termination of coverage for persons who are involved in accidents which are not their fault?
 No. Unless the insurance company cannot meet the conditions set by statute.
5. Can the Division of Insurance mandate that insurance premium rates be based on driving record and miles driven and that premium rates cannot be based on neighborhood location?
No.
6. Can the Division of Insurance prohibit insurance companies from charging higher rates (surcharges) for drivers with good records who have not had automobile insurance for a period of time but who wish to be insured again?
 No, unless the insurer is unable to demonstrate that the fact that the insured has gone uninsured for period of time will have a probable effect upon losses incurred by the insurance company.
ANALYSIS
Colorado's insurance rating statute §§ 10-4-401 to 419, C.R.S. (1987) addresses property and casualty insurance premiums. The statute divides all property and casualty insurance lines into two categories — type I and type II. Type I coverage consists of worker's compensation, medical malpractice coverage written by joint underwriting associations and assigned risk motor vehicle insurance. See § 10-4-401(3)(a), C.R.S. (1987). Type I coverage is a "prior approval" coverage. This means that the insurer, before changing his rates, must file the new proposed rates with the Division of Insurance (hereinafter "the Division") and get its approval before implementing them.
All other types of property/casualty coverage are classified as type II insurance. Automobile insurance with the exception of assigned risk motor vehicle coverage is a type II coverage. Type II insurance coverage is a "file and use" coverage which means that the insurer must only file its proposed rates with the Division before putting them into effect. See §10-4-401(3) and (4), C.R.S. (1987). There is no requirement with regard to type II coverage that the insurer obtain the Division's approval before implementing new rates.
Sections 10-4-405 and 406, C.R.S. (1987) establish a procedure pursuant to which the Division can review all type I rates before they are implemented by the insurer. Type II coverages are not subject to §§ 10-4-405 and 406. See §10-4-401(3)(b), C.R.S. (1987). However, under § 10-4-418, C.R.S. (1987) the Commissioner of Insurance (hereinafter "the Commissioner") either on his own motion or in response to a complaint, can commence an agency proceeding for the purpose of determining whether an insurer's automobile insurance rates are in violation of the insurance statutes.
Under § 10-4-403, C.R.S. (1987) both type I and type II rates are subject to the requirement that they be neither excessive nor inadequate nor unfairly discriminatory. If the Commissioner believes that an automobile insurer's rates are excessive, he may commence an agency proceeding pursuant to § 10-4-418. Following such an agency hearing the Commissioner, if appropriate, may find that an insurer's rates are excessive and may enter an order "stating when, within a reasonable period of time, the further use of such rate or rating system by such insurer . . . in contracts of insurance made thereafter shall be prohibited." Section 10-4-418(4)(a).
Questions 1, 2, and 3
Under § 10-4-418 the Commissioner may review an insurer's current automobile insurance rates, find them to be excessive and, commencing at some future date, prohibit the further use of the rates. The Commissioner could therefore determine that an individual insurer's auto rates were excessive by 20 percent and order the insurer to cut its rates by 20 percent. Under §10-4-418 the Commissioner would not have the power to enter an order requiring all auto insurers to cut their rates by 20 percent unless he had commenced a hearing with regard to all auto insurers and had concluded that all auto insurers had rates which were exactly 20 percent excessive. This is a highly unlikely event.
As noted above, under § 10-4-418(4)(a) the Commissioner has the power to halt prospectively the use of an excessive automobile insurance rate. The rating statute allows insurers to be flexible in that it permits them to respond to changing market conditions such as loss frequency and severity by changing their rates. In order for the Commissioner to enter an order prohibiting all insurance companies from increasing their rates for any particular period of time he would have to determine that there could be no future change in market conditions which could justify an increase in rates. This is not possible.
It would be unlawful for the Commissioner to determine that notwithstanding any future change in market conditions no insurer could raise its rates for 2 years. Such an order would deprive the insurer of the ability to make a fair profit from selling insurance. As you may know, last year the California voters passed an initiative measure, Proposition 103, which made several changes in California's insurance regulatory scheme. Among other things, Proposition 103 stated that no auto insurer could increase its rates for a period of one year unless the California Insurance Commissioner determined that the insurer's solvency would be substantially threatened if it did not increase its rates. The insurers challenged the constitutionality of Proposition 103. In a recent decision the California Supreme Court determined that insurance companies are entitled to a fair profit, and accordingly declared unconstitutional under the United States and California due process provisions that portion of Proposition 103 which stated that no insurer would be allowed to increase its rates unless its solvency was threatened.Calfarm Insurance Company v. Deukmejian,258 Cal.Rptr. 161, 48 Cal.3d 805, 771 P.2d 1247 (Cal. 1989). TheCalfarm court also found that the past surplus of an insurance company cannot be used to justify current rates that provide less than a fair rate of return. 771 P.2d at 1254.
Although automobile insurance is a type II insurance coverage,i.e., a "file and use" coverage, the Insurance Commissioner does have the power to change any type II coverage to a type I "prior approval" coverage. In order to make automobile insurance a type I coverage the Commissioner would first have to conduct a hearing and determine that there is not sufficient competition in automobile insurance to guarantee that rates will not be excessive or that the nature of the auto insurance market is such that it is destructive of competition or detrimental to the solvency of the participating insurance companies. Section 10-4-403(5). If the Commissioner enters an order making automobile insurance a type I coverage the order can last no longer than 1 year with the possibility of renewal. Section 10-4-403(5).
Question 4
Insurance companies are permitted to implement their rates by grouping their insureds into categories, each category paying different rates depending upon the nature of the category. The insurance company is permitted to establish underwriting guidelines or rules which define the nature of the rating categories and describe the differences between the categories. However, the insurer must be able to demonstrate that its classifications reflect a "probable effect upon losses or expenses." See § 10-4-403(4), C.R.S. (1987). Accordingly in order to penalize an insured for involvement in an auto accident which is not his fault, the insurer must be able to demonstrate actuarially that the fact of the non-fault accident increases the likelihood of future losses to the insurer.
In the last session the General Assembly amended the insurance laws to specifically state that insurance companies cannot increase premiums or terminate coverage as a result of non-fault accidents. See 1989 S.B. 128.[1] However, S.B. 128 specifically permits insurance companies to use non-fault accidents to cancel or non-renew coverage or increase premium only if the insurer has made a summary disclosure of such an underwriting guideline to the policyholder pursuant to §10-4-111(1), C.R.S. (1987). Under § 10-4-111(1) all auto insurers are required to make available summaries of their automobile policies. Under § 10-4-111(1) insurers are only required to file the form with the Division and to have the form available to those who ask to see it.
It is not reasonable to believe that in passing S.B. 128 the legislature on the one hand prohibited insurers from using non-fault accidents and on the other hand permitted insurers to use non-fault accidents upon proving that they had filed with the Division and made available for those who might ask for them, copies of summary disclosure forms. In passing S.B. 128 the legislature specifically relieved insurers from the prohibition in § 10-4-719.7 only where the "summary disclosure of such underwriting policy has been made to the policyholder
in accordance with the provisions of section 10-4-111(1)." (Emphasis added.) It is clear in light of this language that the legislature intended that an underwriting guideline permitting use of non-fault accident could be used only if the sort of summary disclosure form described in § 10-4-111 and including a description of the underwriting guideline was actually given to the policyholder.[2]
Even though S.B. 128 permits an insurer to use non-fault accidents as is noted above, § 10-4-403(4), C.R.S. (1987) would still require such an insurer to demonstrate that persons who have had non-fault accidents pose a greater risk of loss to the insurer.
Questions 5 and 6
Two provisions in the insurance laws speak specifically to the practice of underwriting based on "neighborhood." Section 10-4-719(1), C.R.S. (1987) prohibits an auto insurer from refusing to issue or renew an auto insurance policy "solely" because of the "residence" of the insured. Section 10-3-1104(1)(f)(II), C.R.S. (1987) prohibits all insurers from "unfair discrimination" between "neighborhoods within a municipality and of essentially the same hazard."[3]
Sections 10-3-1104 and 10-4-719 apply to different sets of circumstances. Section 10-4-719 applies only to auto insurance and offers protection against underwriting based on "residence." However it applies only to the issuance and renewal of insurance coverage; it does not apply to premium charges. The statute prohibits an insurer from refusing to issue coverage to someone living in a given neighborhood (i.e. "residence") but does not prohibit charging different rates based on neighborhoods. However, if an insurer wished to charge different rates based on neighborhoods he would be required to demonstrate actuarially that an insured residing in a particular neighborhood posed a greater risk of loss to the insurance company. Section10-4-403(4).
Section 10-4-1104(1)(f)(II) applies to all insurers, not just auto insurers. It prohibits "unfair discrimination" between neighborhoods which pose "essentially the same hazard" to an insurer. The term "essentially the same hazard" embodies the requirement in § 10-4-403(4) that an insurer, in order to lawfully charge different rates to persons residing in different neighborhoods, must show that the fact of residence in a particular neighborhood poses a different likelihood of loss to the insurer.
An insurer who wishes to charge a higher rate to a driver with an otherwise good record who had not had coverage for a period of time would also have to comply with §§ 10-4-403(4) and10-3-1104(1)(f)(II). The latter section prohibits unfair discrimination between persons of the "same class . . . and of essentially the same hazard." Once again this language paraphrases the requirement in § 10-4-403(4) that an insurer demonstrate that his underwriting guidelines reflect a probable difference in losses by the insurer. Accordingly, an insurer who uses an underwriting guideline which charges higher rates to an applicant who has a good driving record but who has not had insurance coverage for a period of time would be required to demonstrate that such an insured would have a probable effect on the insurer's losses.
SUMMARY
The Division of Insurance cannot require all insurance companies to cut all automobile insurance premiums by 20 percent. Likewise, the Division cannot require that all insurance companies not raise automobile insurance premiums for 2 years. The Division can upon hearing enter an order requiring all auto insurers to obtain prior approval before they raise their rates.
The insurance laws specifically permit the use of non-fault accidents in underwriting. However, the law prohibits their use if the insurer either has not provided disclosure to the policyholder that such a rule is a part of its underwriting guidelines or is unable to demonstrate that such an underwriting guideline reflects a probable increase in losses or expenses. The law would permit premium rates to be based on neighborhood location or the fact that a driver with a good record had not had automobile insurance for a period of time only if the insurer could demonstrate that these factors have a probable effect on losses incurred.
Sincerely,
 DUANE WOODARD Attorney General
INDEX
Subjects: Insurance, Premiums, Motor Vehicles
Statutes construed: Section 10-4-403(4), C.R.S. (1987)
Section 10-4-719.7, C.R.S. (1987)
Section 10-4-418, C.R.S. (1987)
Section 10-4-719, C.R.S. (1987)
Section 10-3-1104(1)(f)(II), C.R.S. (1987)
SYNOPSIS: Insurance Commissioner cannot order an across the board 20 percent cut in auto insurance rates. Insurance Commissioner cannot prohibit all auto insurers from increasing their rates for 2 years. The Insurance Commissioner can require auto insurers to get prior approval of premiums. Insurers can terminate coverage and increase premiums for persons who are involved in non-fault accidents. An insurer is permitted to base rates on neighborhood location.
[1] 1989 S.B. 128 provides in part:
 10-4-719.7. Changes in or cancellation or nonrenewal of policies prohibited.
 (1) With respect to an insurance policy affording the coverage required by this part 7, no insurer shall cancel or fail to renew such policy, reclassify an insured, reduce coverage unless the reduction is part of a general reduction in coverage approved by the commissioner, or increase the premium for such policy unless the increase is part of a general increase in premiums filed with the commissioner, solely because the insured or any resident of the household of the insured has had an accident or accidents which are not the fault of such named insured or household member. The prohibitions set forth in this section shall not apply where summary disclosure of such underwriting policy has been made to the policyholder in accordance with the provisions of section 10-4-111 (1).
 (2) An insured who believes the provisions of subsection (1) of this section have been violated shall have the right to file a protest with the commissioner pursuant to the provisions of section 10-4-720.
 (3) The commissioner shall promulgate rules and regulations to implement the provisions of this section.
[2] A review of the legislative committee discussions on this bill also indicate a legislative intention to require that actual rather than constructive notice be given to all policyholders:
 1. Senator Trujillo, the sponsor of the bill, stated when explaining the purposes of the bill that . . . `we saw that even though he didn't cause the accident, a policyholders premium could be increased. We wanted to curb that. What I have found out after several meetings with the industry is that the premium and the contract when the person buys the insurance state that if he is involved in a not fault chargeable accident his policy can increase. In our amendment we are asking that notice be given to an individual, written notice, when he buys that policy that he be made aware of that when he is involved in an accident the premium could increase even if he is not at fault.' S.B. 128 (1989), Senate Committee on Business Affairs and Labor, audio tape dated 2/1/89.
 2. Senator Traylor asked about the kind of notice which had to be given, if it was verbal or written and if written whether it was placed in the policy on some back page in small print. Bill Imig of the National Association of Independent Insurers and Senator Trujillo answered her stating that `Section 10-4-111, C.R.S. (1985) requires that written disclosure be given to the person buying the insurance, written notification in writing at the time you purchase the policy.' S.B. 128 (1989), Senate Committee on Business Affairs and Labor, audio tape dated 2/1/89.
 3. Bill Imig of the National Association of Independent Insurers in discussing the fact that some companies, . . . offer reduced rates to drivers who have good driving records but that a driver knows that that policy premium is going to go up if he has an accident stated that . . . `this amendment validates that kind of policy provided that the insured knows about it before he buys the policy' S.B. 128 (1989), Senate Committee on Business Affairs and Labor, audio tape dated 2/1/89.
 4. Bill Imig of the National Association of Independent Insurers in giving testimony about the bill when discussing what kind of notice would be given stated that it would be disclosure in advance to the insurer, in advance of the purchase of the policy. S.B. 128 (1989), House Committee on Business Affairs and Labor, audio tape dated 3/9/89.
[3] In insurance jargon a "hazard" is a situation that increases the probability of loss. See Glossary of Insurance Terms, The Merritt Company, (1980).