[No. G037410. Fourth Dist., Div. Three. Nov. 13, 2007.]

MERCURY CASUALTY COMPANY, Plaintiff and Respondent, v. SCOTTSDALE INDEMNITY COMPANY, Defendant and Appellant.

1214

COUNSEL

Selman Breitman, Alan B. Yuter, David M. Berke and Rachel E. Hobbs for Defendant and Appellant.

O'Connor & Schmeltzer, Lee P. O'Connor and Timothy J. O'Connor for Plaintiff and Respondent.

OPINION

**BEDSWORTH, Acting P. J.**—Scottsdale Indemnity Company appeals from a judgment entered against it after the trial court granted a motion for summary judgment by Mercury Casualty Company (Mercury). Scottsdale contends the court erred in refusing to allow it to take discovery relating to the passage of Insurance Code section 11580.9, subdivision (g) (hereinafter section 11580.9(g) or the legislation) and Mercury's involvement in that process.

Scottsdale feels the legislation, which requires both primary and excess automobile liability insurers to contribute to the cost of defending an insured in proportion to the amount each pays to satisfy the liability claim, constitutes "special interest" legislation passed for the specific benefit of Mercury, and violates the contracts clause of the United States Constitution, as well as the due process clauses of both the United States and California Constitutions. Its argument is that if it had been allowed to complete its requested discovery in this case, it would have been able to establish a dispute of fact with regard to those issues.

We are not persuaded. Even assuming Mercury was the primary force behind the successful legislation, we can discern no basis to invalidate it. The statute's legislative history, submitted to the trial court by Scottsdale, reflects the legislation was intended to further a significant *public* benefit—not merely to provide a "windfall" to Mercury and other primary automobile insurers. The fact the legislation *also* benefits Mercury and its ilk establishes nothing more than that Mercury may not have been entirely selfless in its lobbying efforts. If the mixed motives of a legislative proponent, standing alone, were a basis for overturning legislation, we would have very few laws so it should come as no surprise that we find no authority for this kind of review.

Apart from Mercury's allegedly self-interested conduct before the Legislature, Scottsdale has nothing. Scottsdale cannot establish the legislation impaired its constitutional right to contract, as it was enacted several years *before* Scottsdale issued the policy in this case. Similarly, we can neither presume the legislation is "arbitrary" merely because Scottsdale contends it is, nor conclude it "serves no legitimate purpose" just because it may not have been successful in achieving its stated purpose.

And finally, we cannot agree the legislation even distinguishes "between similarly situated *types of excess insurers*" as Scottsdale claims. (Italics added.) Scottsdale has made no showing that there exist distinct and immutable categories of "insurers," let alone of "excess insurers," who are necessarily affected one way or the other by this legislation. What the legislation does is regulate *all insurers*, both primary and excess, with regard to the payment of defense costs incurred in conjunction with *personal automobile liability policies*. As such, what the legislation regulates is a type of insurance; what it affects are those insurers who choose to sell that type of insurance; and it affects them equally. There is no constitutional violation.

* * *

Mercury and Scottsdale each issued automobile liability policies to the same insured. Mercury's policy was primary, and Scottsdale's was secondary, or "excess." The Scottsdale policy, issued in April of 2003, contained a provision specifying Scottsdale had no duty to provide a defense to the insured in the event of a claim, unless "no other insurer has an obligation to do so."

The insured was involved in an accident during the coverage period of both policies, and a lawsuit was filed against her. Mercury provided a defense to the lawsuit, which was ultimately settled. Mercury paid the limits of its policy toward the settlement, and Scottsdale paid the remaining amount.

Mercury then demanded Scottsdale reimburse it for a portion of the expense of providing the insured's defense, in accordance with the requirement of section 11580.9(g). Scottsdale refused, and, as a consequence, Mercury filed this action for declaratory relief against Scottsdale in May of 2005.

Scottsdale answered the complaint, and denied liability on the basis that its policy did not impose upon it any duty to defend the insured in this case. Scottsdale further alleged that section 11580.9(g) was unenforceable as it violated the California and United States Constitutions, and that Mercury was barred from recovery based on the doctrine of "unclean hands."

In October of 2005, Scottsdale served Mercury with what can fairly be described as a barrage of discovery demands, all designed to ferret out the extent of Mercury's involvement in the passage of section 11580.9(g) and to establish that the Legislature's true motive in passing the legislation was to "serve the private interests of a small and favored group," which included Mercury and other insurers who provide primary automobile liability coverage to individual consumers.[1] Mercury declined to provide the bulk of this discovery, contending it was not reasonably calculated to lead to the discovery of admissible evidence.

---

[1] Included within this discovery were interrogatories requesting, among other things, that Mercury (1) identify every person involved in the passage of the bill, including the names, addresses and telephone numbers of anyone who so much as "attended any meeting in which anyone . . . discussed the possibility of sponsoring the bill"; and (2) provide both the date *and time* of every meeting or consultation within the Legislature regarding the bill, as well as each date and time the bill was submitted to *any member* of the Legislature. Mercury was also requested to admit, among other things, that "when the premiums on excess insurance policies are calculated, they do not account for the excess insurer being required to pay attorneys fees," and that "§ 11580.9(g) is unconstitutional" for no less than nine separate reasons. And of course, a form interrogatory requested that to the extent Mercury could not unqualifiedly admit each of the requested admissions, it provide substantial additional information relating to its

In November of 2005, Mercury moved for summary judgment, asserting it was entitled to payment from Scottsdale pursuant to the statute. While that motion was pending, Scottsdale moved to compel further responses to its discovery. Those motions were denied and Scottsdale served an additional round of discovery on Mercury.[2]

In opposition to Mercury's summary judgment motion, Scottsdale asserted additional facts, not included in the motion, such as: (1) Mercury sponsored and wrote the legislation that ultimately became section 11580.9(g), and the Legislature conducted no independent analysis of the contentions raised by Mercury in support of it; (2) Mercury itself refused to disclose whether it had lowered rates in the wake of the legislation's passage, while Scottsdale's level of participation in settlements involving its excess policies was unaffected—both of which suggested the legislation had been ineffective in achieving its alleged purpose; and (3) the legislation actually serves no public interest, was unnecessary, and was designed to operate as a "windfall" for Mercury.

Scottsdale argued the court's consideration of the summary judgment motion was inappropriate until after it had completed its outstanding discovery,[3] all of which was designed to support the additional facts it had asserted. Based upon those facts, Scottsdale claimed it would be able to show that

---

denials. This is the level to which "civil" practice has sunk. Detective novelist Raymond Chandler, who once said, "Americans have none of the irony of the English . . ." died too soon.

[2] Included within this second round of discovery were interrogatories which requested that Mercury lay out each and every fact supporting each of the bases it allegedly relied upon in lobbying for passage of the bill which ultimately became section 11580.9(g). Scottsdale also propounded requests for production of documents, seeking among other things, all documents submitted by Mercury to the Legislature in support of each of its alleged claims in favor of the proposed legislation; all documents containing "legislative history . . . reflecting or relating in any way" to section 11580.9(g); and all documents demonstrating that the statute "does not serve a private interest." Also included were requests for Mercury to admit that it had made various arguments to the Legislature as to why section 11580.9(g) would provide benefits to the public; that the Legislature engaged in no "independent evaluation" of those claims, and that the claims proved to be untrue. And again, there was a form interrogatory requiring Mercury to supply detailed information relating to any of the requested admission that it could not unqualifiedly admit.

[3] Scottsdale served a third set of special interrogatories after it filed its opposition to the summary judgment motion. These interrogatories requested that Mercury identify all facts and evidence suggesting that excess carriers had "dragged out and added to the expense of claims settlement" prior to the enactment of section 11580.9(g), and to reveal how many times it had sought recovery of defense costs from an excess insurer after passage of section 11580.9(g), and how much it had recovered.

section 11580.9(g) was a "sham" which had achieved "no public purpose," and was instead intended to operate as a private benefit for Mercury. After considering the parties' arguments, the court granted Mercury's motion, and judgment was entered in its favor.

## I

■ Scottsdale contends section 11580.9(g) is invalid and unenforceable for a number of reasons. In making these arguments, Scottsdale takes on a gordian task. As this court has previously explained, "[s]tatutes are presumed to be valid and a court will not strike down a legislative enactment unless its invalidity is clearly established. Mere doubt as to a law's validity will not support invalidating it. (*Tobe* v. *City of Santa Ana* (1995) 9 Cal.4th 1069, 1102 [40 Cal.Rptr.2d 402, 892 P.2d 1145]; *CalFarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 814–815 [258 Cal.Rptr. 161, 771 P.2d 1247].) Furthermore, judicial review of a statute does not involve a consideration of the legislation's wisdom. (*CalFarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at p. 814.)" (*Costa v. Workers' Comp. Appeals Bd.* (1998) 65 Cal.App.4th 1177, 1183–1184 [77 Cal.Rptr.2d 289].)

■ And in evaluating a statute, we must focus on what it actually says, rather than on what it is arguably intended to achieve. "It cannot be too often repeated that due respect for the political branches of our government requires us to interpret the laws in accordance with the expressed intention of the Legislature. . . . [¶] 'Our first step [in determining the Legislature's intent] is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning.' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175], quoting *People v. Valladoli* (1996) 13 Cal.4th 590, 597 [54 Cal.Rptr.2d 695, 918 P.2d 999].) Unfortunately, Scottsdale has given short shrift to the statutory language in this case, and essentially skipped right to the arguments concerning its allegedly unfair and improper purpose.

What section 11580.9(g) actually says is this: "Where two or more personal policies affording valid and collectible liability insurance apply to the same motor vehicle in an occurrence out of which a loss shall arise, and one policy, as defined in subdivision (a) of Section 660, is primary, either by its terms or by operation of law, and one or more of the personal policies providing liability insurance, as defined in Section 108, are excess, either by their terms or by operation of law, then the following shall apply: [¶] (1) Each insurer shall pay its share of the defense costs. Each insurer's share of the defense costs shall be the percentage of the total defense costs equal to the amount of damage paid by that insurer as a percentage of total damages paid by all insurers whose policies apply to that motor vehicle. [¶] (2) The term

'defense costs' means, for purposes of this subdivision, reasonable attorney's fees and expenses, investigation expenses, expert witness fees, and costs allowable under Section 1033.5 of the Code of Civil Procedure." With that background, we consider each of Scottsdale's arguments.

## II

Scottsdale first asserts that section 11580.9(g) violates its constitutional right to equal protection under the law. (U.S. Const., 14th Amend.)[4] However, contrary to Scottsdale's arguments, there is nothing in the language of section 11580.9(g) that "favors" those insurers who sell primary automobile liability policies. The statute says nothing about relieving them of preexisting obligations to pay the cost of defending the insured, nor does it require any "shifting" of a portion of that obligation onto excess insurers, who otherwise would have no duty to defend. What the legislation does say is that *all insurers*, whether primary or excess, must contribute to defense costs in proportion to their share of the liability covered by the individual automobile liability policy they issued. Thus, the legislation, on its face, would seem to impose the same obligation on both primary and excess carriers who offer policies covering individual automobile liability.

Moreover, the legislation draws no distinction between "similarly situated groups of [excess] insurers," as Scottsdale claims. What it does is regulate a category of insurance. Importantly, Scottsdale makes no effort to establish, and we have no basis to conclude, that there exists some immutable difference between those insurers who sell excess automobile liability policies to individuals, and those who sell other types of liability insurance. To the contrary, Scottsdale's own evidence demonstrates that insurers are not tied exclusively to one category of coverage or another. Scottsdale itself claims to sell *"both primary and excess policies,"* and does not claim that those policies are limited to the area of automobile liability.

█ Thus, section 11580.9(g) regulates only a category of insurance, and affects only those insurers who *choose to sell the policies that fall within its purview*. As such, it both applies to, and affects, Scottsdale in exactly the same manner it does every other insurer—including Mercury. And according to Scottsdale's own evidence, it has even reaped the "benefits" of the legislation every time it has sold one of its primary automobile liability policies in California.

---

[4] Scottsdale asserts that the legislation violates its right to equal protection under both the federal and California Constitutions, but cites only the United States Constitution—and federal cases—in its argument.

Indeed, even if we look behind the actual language of section 11580.9(g) to determine the practical impact its passage had on insurers (as Scottsdale is apparently eager to have us do), we cannot discern that it *created* any inequality under the law. To the contrary, it appears to do the opposite. According to the legislative history supplied by Scottsdale, the effect of the proposed legislation was merely to spread out the burden of defense costs in cases involving personal automobile liability policies—a burden which prior law had imposed *only on primary insurers*—in the hope that the specter of a growing expense might encourage excess insurers to involve themselves in settlement at an earlier point.[5] Thus, this legislative history suggests that the practical impact of section 11580.9(g) was to equalize a burden that prior law had placed entirely on primary carriers—in other words, to treat insurers more equally, rather than less.

Because Scottsdale has failed to demonstrate it has been affected by section 11580.9(g) in any manner which differs from the legislation's effect on every other insurer, we reject its assertion the legislation violates its right to equal protection.

## III

Scottsdale next argues section 11580.9(g) is "arbitrary," because it draws inappropriate distinctions, serves no valid purpose, and does not "meaningfully advance[] the stated purpose of encouraging settlement." According to Scottsdale, the true purpose of the legislation was to provide a private benefit to Mercury and the "small group of insurers" who, like Mercury, sell primary automobile liability policies to individual consumers. Scottsdale therefore contends the enactment of this legislation constituted a violation of its right to due process under the Fourteenth Amendment of the United States Constitution.[6]

In support of these arguments, Scottsdale relies on the following factual assertions: that Mercury promoted the legislation, possibly even wrote it, and

---

[5] As characterized by the Assembly Committee on Insurance, the prior law provided that "[w]here a motor vehicle is covered by 2 or more liability insurance policies, the primary insurer is required to provide a defense until the policy limit of the primary policy has been exhausted by payments, or the primary insurer offers in settlement the full amount of its policy limits." (Assem. Com. on Ins., Analysis of Assem. Bill No. 2890 (1993–1994 Reg. Sess.) as introduced Feb. 17, 1994, p. 1.)

[6] Scottsdale asserts the legislation violates its right to due process under both the Federal and California Constitutions, but again cites only the United States Constitution—and federal cases—in its argument.

is a mainstay of the "small group of insurers" who benefited from its passage. Scottsdale goes so far as to assert that the Legislature engaged in no independent analysis of the provision or its purposes, and that the purported public purpose to be advanced by it is a "sham." The latter assertion is then supported, in turn, by assertions the law was too narrowly drawn to achieve its stated purpose, and was, in any event, unnecessary.

Of these assertions, only one is supported by any evidence—according to the legislative history relied upon by Scottsdale, Mercury is identified as the "sponsor" of the bill which ultimately became section 11580.9(g). However, that same legislative history is actually *inconsistent* with the assertions that Mercury "wrote" the legislation and that the Legislature gave it no independent consideration—because the bill *initially* sponsored by Mercury was apparently quite different from the legislation actually passed.[7]

In any event, we cannot accept Scottsdale's implicit assertion that there would be anything suspicious, let alone sinister, in the fact that Mercury promoted the legislation, or even had a hand in its drafting. "Special interests" have been affecting the content of our laws for as long as our Legislatures have been passing them, and while reasonable minds can (and do) disagree about whether that effect is too significant to serve the common good, no one contends that our constitutional right to petition the government should be abolished. (Cal. Const., art. I, § 3, subd. (a) ["The people have the right to instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good."].) Mercury was clearly entitled to petition the Legislature in support of any proposed legislation it chose to favor. As is Scottsdale.

As for the assertion that Mercury is the dominant member of the "small group of insurers" who benefited from the enactment of section 11580.9(g), Scottsdale offers no evidence to support the assumptions inherent in that statement: that there is but a small group of insurers offering automobile liability coverage in California, and that Mercury is the most significant member of that group.

---

[7] According to the legislative history information submitted by Scottsdale, as initially conceived, the proposed legislation would have provided "that, upon notice from the primary insurer that its duty to defend has ended, the excess insurers shall provide the defense. . . . [And if the excess insurers refuse to provide a defense after the notice], the primary insurer would provide the defense but would be entitled to recover costs and interest from the excess insurers." (Assem. Bill No. 2890 (1993–1994 Reg. Sess.) as introduced Feb. 17, 1994.)

■ Similarly unpersuasive is Scottsdale's attempt to establish that the Legislature engaged in no "independent evaluation" of the merits of Mercury's contentions in favor of section 11580.9(g). Again, Scottsdale's own legislative history evidence demonstrates the legislation initially proposed by Mercury was substantially altered during the legislative process. Moreover, comments in opposition to the proposed legislation are included in the legislative history. Finally, we must necessarily presume the Legislature engaged in as much evaluation—independent or otherwise—of proposed legislation as it concluded was necessary to fairly consider the pertinent issues. We simply cannot, no matter what the "evidence" might suggest, begin questioning *the extent of thought* which the Legislature chooses to give to a certain issue. " 'We do not consider or weigh the economic or social wisdom or general propriety of [the legislation]. Rather, our sole function is to evaluate [it] legally in the light of established constitutional standards.' (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281].)" (*Calfarm Ins. Co. v. Deukmejian, supra*, 48 Cal.3d at p. 814.)

Scottsdale's overarching contention, that the legislation is a "sham," is also based in part on its assertions that section 11580.9(g) was too narrowly drawn to achieve its stated purpose—which was to give excess insurers an incentive to participate earlier in the process of settling liability claims—and that there was no need for such an incentive in the first place.

According to Scottsdale, the Legislature's decision to promulgate legislation which covers allocation of defense costs *only with respect to personal automobile policies* is suspect, because the goal of promoting earlier settlements in cases involving excess policies should apply to *all situations* in which excess liability policies are available: "Out of the universe of insurance, automobile is but one type thereof. Similarly, of the universe of automobile insurance, personal automobile (rather than commercial, trucking, or specialty) insurance is but one section thereof. Accordingly, despite the stated broad legislative purpose, section 11580.9(g) is so narrowly aimed as to suggest that other, improper reasons are behind the legislation." Scottsdale goes on to assert "there is no conceivable reason for distinguishing between *the different types of insurers* in this fashion."

Again, this argument is constructed upon a foundation of unsupported assumptions. Scottsdale's main assumptions are: (1) personal automobile liability policies represent only a small percentage of the excess insurance market; (2) there are no reasons why excess insurers should be encouraged to treat individual consumers any differently than they treat commercial purchasers; (3) there is some equal need to encourage excess carriers to participate in the settlement of liability claims other than those involving

personal automobiles; and (4) those other types of excess policies typically contain the same provisions exonerating the insurers from any responsibility for defense costs as Scottsdale has attempted to enforce here. Scottsdale presents no evidence to support any of these assumptions, and cannot claim that Mercury's purported intransigence in discovery was responsible for the lapse because these would not be facts uniquely known to Mercury.[8]

Scottsdale's argument also contains logical flaws, including confounding the issue of what percentage of excess liability policies are purchased to cover personal automobiles with the issue of what *percentage of litigation* those policies represent; and confusing the issue of whether the Legislature is drawing distinctions among insurers (as Scottsdale claims) or among *insureds.*

As to the first of those flaws, even if we did adopt Scottsdale's unsupported assertion that personal automobile liability policies represent but a small portion of the excess insurance market—say 10 percent—that is certainly not the same thing as saying that those policies represent only 10 percent *of the litigation involving excess carriers.* And it is specifically *the cost of that litigation* which section 11580.9(g) is intended to address. As to the second, we have already pointed out that section 11580.9(g) draws no distinctions among insurers; instead, it regulates a type of insurance—and thus a category of potential insureds. The insurers affected are simply those who choose to sell that type of insurance. Scottsdale and all other insurers are free to choose to sell primary or excess coverage, and apparently have chosen to sell both. It is therefore difficult indeed to see how they have been discriminated against.

Scottsdale's final contention, that section 11580.9(g) is revealed to be a "sham" because prior to its passage, there was no problem with the level of excess insurers' participation in settlement, is similarly unsupported and unpersuasive. The only evidence Scottsdale offered in support of this contention is a declaration from one of its own claims representatives, stating Scottsdale itself has never considered its status as either primary or excess insurer as a factor in its approach to settling liability claims, and offering the conclusory assertion such an approach is "standard practice among insurance companies." But even assuming there was significant evidence from which a trier of fact might discern that section 11580.9(g) was not actually necessary, or that some or all of Mercury's arguments in support of it were incorrect, we

---

[8] See part V, *post.*

could not intervene. As we have already noted, " '[w]e do not consider or weigh the economic or social wisdom or general propriety of [the legislation].' " (*Calfarm Ins. Co. v. Deukmejian, supra,* 48 Cal.3d at p. 814.) Arguments concerning the wisdom, propriety or efficacy of legislation should be addressed to the Legislature.

For all of the foregoing reasons, we conclude Scottsdale failed to raise a triable issue of fact in support of its contention that section 11580.9(g) is, or was intended to be, anything other than what it purports to be—an even-handed regulation requiring that all insurers must bear the same portion of the cost of defending a personal automobile liability claim as they pay to satisfy the claim itself. The trial court was correct.

## IV

 Scottsdale also contends section 11580.9(g) violates its rights under the contracts clause of the United States Constitution. That clause provides: "No State shall . . . pass any . . . law impairing the obligation of contracts." (U.S. Const., art. I, § 10.) As explained in *Allied Structural Steel Co. v. Spannaus* (1978) 438 U.S. 234, 242 [57 L.Ed.2d 727, 98 S.Ct. 2716], the contracts clause imposes "limits upon the power of a State to abridge *existing contractual relationships*, even in the exercise of its otherwise legitimate police power." (Italics added.)

As that language from *Allied Structural Steel* suggests, the contracts clause is not implicated when the allegedly impaired contractual relationship was entered into *after* the effective date of the disputed law. (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside* (1984) 157 Cal.App.3d 887, 908–909 [204 Cal.Rptr. 239]; *Watson v. Employers Liability Corp.* (1954) 348 U.S. 66, 70 [99 L.Ed. 74, 75 S.Ct. 166].) That is the case here. Section 11580.9(g) was enacted in 1994, while the Scottsdale policy at issue was issued in 2003.

It is well settled that contracts are deemed to incorporate applicable statutes in effect at the time the contract is made. (*14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1410 [74 Cal.Rptr.2d 712] ["the instrument is deemed to incorporate pertinent statutory law . . . ." (citation omitted)].) Consequently, once section 11580.9(g) was enacted, its provisions automatically became a part of any new personal automobile liability policies issued in California as a matter of law. If Scottsdale did not wish to enter into such policies, it need not have done so. But it cannot now complain that its rights under those subsequent policies were "impaired."

## V

Finally, Scottsdale contends the trial court erred in granting summary judgment before allowing Scottsdale to complete its discovery in this case. Scottsdale argues discovery is necessary in this case because "the legislation at issue would *appear to address* only a vanishingly small portion [i.e., personal automobile liability policies] of the problem at issue [apparently *all* situations in which stacked liability policies come into play]. As such, it is unlikely to meaningfully advance the purpose, and . . . Scottsdale should have been permitted to demonstrate that the purpose was a 'sham' . . . [¶] [and that] Insurance Code section 11580.9(g) was conceived, written, lobbied and *passed*, solely for the benefit of Mercury (and perhaps a small group of similarly situated insurers)." (Italics added.)

We are about as unpersuaded as we can be. As we have already explained, the primary flaw in Scottsdale's arguments is that they are largely based upon unsupported assertions about the insurance industry and a flawed analysis of the effect section 11580.9(g) purportedly has on alleged "categories" of insurers. None of these assertions were dependent upon information obtainable only from Mercury. For example, Mercury would certainly not be the sole source of evidence to support Scottsdale's assertion that section 11580.9(g) "appears to address only a . . . small portion of the problem at issue." And yet Scottsdale offered no evidence at all to support that conclusion.

Moreover, we must categorically reject Scottsdale's contention that "*the absence of . . . evidence* that such legislation was required, or that it served its alleged purpose of lowering insurance premiums paid by consumers *tends to suggest that it was passed for the improper purpose* of benefiting a small favored subgroup of insurance carriers like Mercury . . . ." (Italics added.) In fact, the opposite is true. Because legislation is presumed valid, the *absence* of evidence cannot be used to defeat it.

In the absence of evidence, we must presume in favor of the statute; i.e., that the "problem at issue" when section 11580.9(g) was enacted was exactly what the Legislature claimed it was—the unsatisfactory participation of excess insurers in the process of settling claims involving personal automobile liability policies. If the Legislature passed a law outlawing red shoes, we would not presume—based upon one party's insistence—that what it should have been trying to do was outlaw *all shoes*; nor would we conclude that the statute passed was inadequate because it "addressed only a . . . small portion of the problem at issue." We would presume the "problem at issue" was red shoes, and that the statute addressed that problem to the Legislature's satisfaction.

The only *evidence* Scottsdale has offered to dispute section 11580.9(g)'s presumed validity is the legislative history which appears to show that Mercury was the driving force behind passage of the legislation. Such involvement is proper, however, and Scottsdale's attempt to spin it into something sinister has never risen above the level of rank speculation and innuendo.

Nor are we impressed by Scottsdale's assertion that further discovery might have established Mercury was guilty of "unclean hands" in its lobbying efforts before the Legislature. First, Scottsdale offers no authority for such a defense to enforcement of a statute. And second, even assuming the existence of such a defense, and further assuming Scottsdale could establish that Mercury had made provably false assertions in its quest to obtain passage of section 11580.9(g), we could not presume the Legislature blindly relied upon those assertions, and would not have passed the legislation in their absence. Statutory construction is difficult enough without adding mindreading to the task.

Because there was no evidence suggesting that Mercury bribed or otherwise engaged in some *illegal* attempt to influence a sufficient number of legislators to affect the passage of section 11580.9(g), its petitioning activity simply does not merit Scottsdale's disapprobation. And because Scottsdale offered the trial court no evidence even suggesting that either the Legislature or Mercury had acted improperly in connection with the passage of section 11580.9(g), the court was not obligated to either deny or delay adjudication of the summary judgment motion to allow further investigation of those claims.[9]

■ Neither Scottsdale nor anyone else (including us) can have legislation invalidated on the basis it was unwise or ineffectual. And Scottsdale has offered nothing to show this legislation was unconstitutional. Until it does, there is no factual issue to be disputed. The trial court correctly granted summary judgment.

---

[9] Code of Civil Procedure section 437c, subdivision (h) governs continuances of summary judgment motions. It states in pertinent part: "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that *facts essential to justify opposition* may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just." (Italics added.) This imbues the trial court with considerable discretion, which appears to us to have been impeccably exercised in this instance.

The judgment is affirmed. Mercury is entitled to recover its costs on appeal.

Moore, J., and Aronson, J., concurred.